IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PETER WRIGHT | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : Civil Action No: 1:07-CV-01808 RBW |
| | : |
| METROPOLITAN LIFE INSURANCE | : |
| COMPANY d/b/a METLIFE DISABILITY | : |
| | : |
| and | : |
| | : |
| BEARINGPOINT, INC. LONG TERM | : |
| DISABILITY PLAN, | : |
| | : |
| Defendants. | : |

**PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Peter Wright, by and through his counsel, hereby moves for Summary

Judgement in this case, and in so doing, sets forth the following:

Plaintiff's Motion for Summary Judgment is supported by the attached Memorandum of

Points and Authorities.

WHEREFORE, Plaintiff respectfully request that this Court grant his motion in his favor

and be awarded benefits, interest, attorney fees, penalties and costs in addition to any other relief

to him as the Court deems just and appropriate.

Respectfully submitted,

_____/s/_____
Scott B. Elkind, Bar 43881
Elkind & Shea
801 Roeder Rd., Ste. 550
Silver Spring, MD 20910
P: (301) 495-6665
F: (301) 565-5111
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER WRIGHT                                    :
                                                :
          Plaintiff,                            :
                                                :
v.                                              : Civil Action No: 1:07-CV-01808 RBW
                                                :
METROPOLITAN LIFE INSURANCE                     :
COMPANY d/b/a METLIFE DISABILITY                :
                                                :
and                                             :
                                                :
BEARINGPOINT, INC. LONG TERM                    :
DISABILITY PLAN,                                :
                                                :
          Defendants.                           :

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Peter Wright, by and through his counsel, hereby sets forth the following

Memorandum of Points and Authorities in Support of Plaintiff's Cross Motion for Summary

Judgement, and in doing so, states as follows:

**CLAIM FILE ADMINISTRATIVE NOTICE:**

Defendants have produced a claim file which has been manipulated.  This has been

grossly demonstrated with only the partial inclusion of Wright's final appeal letter submitted on

2/5/07 at (ML 02215 - 50) with the remainder attached hereto as Exhibit A).  This letter was

accompanied by 1738 numbered pages of documentation (page numbering in lower center of

pages) only part of which have been made part of the record submitted to this Court with many

portions inserted out of order.

The conduct by Defendants' in manipulating the claim file to exclude important portions

1

must be considered purposeful.  Even if this bad conduct cannot be deemed purposeful, it reveals very poor claim handling practices.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

*MetLife and BearingPoint Failure to Provide Information*

Wright's initial counsel sent a request for the claim file, claim handling materials, summary plan documents, and many other documents on 1/21/05 (ML 460- 5)

Upon retention, Wright's counsel sent letters to both MetLife and BearingPoint requesting pertinent documents including the claim file, summary plan documents, claim manuals, etc. (MetLife Request Letter dated at ML 00864 - 6, 02256 - 8) with follow-up requests to both MetLife and Bearing Point (See MetLife letter dated 10/24/06 at ML 02261 along with Attached Exhibit B for BearingPoint request and follow-up request letter and fax receipt acknowledged by Defendant's in their Statement of Undisputed Material Facts at ¶ 27).

MetLife was advised of the noncompliance by BearingPoint by Wright's counsel on several occasions including a 12/15/06 phone call (Claim Note at ML 00120).

MetLife responded by redirecting Wright's Counsel to KPMG time and again. (Claim Notes at 12/15/06 at ML 00120 - 1, 10/26/06 at ML 00122).  This same conduct was undertaken with previous Plaintiff's Counsel as evidenced by MetLife's letter dated 9/12/05 (ML 000105 - 6).  MetLife continued with this course of refusal in its final denial letter dated 5/11/07 (ML 00192 - 3).

MetLife has withheld a series of documents despite proper requests by Wright's Counsel.

---

[1]To reduce briefing length and avoid redundancy, Plaintiff has adopted Defendants' recitation of Undisputed Material Facts with clarifications as set forth in Wright's Statement of Facts which includes additional facts not cited by Defendants and corrected facts.

2

Withheld documents include the list of documents at ML 00103 (documents at 104 - 113) as this case was deemed as "litigation file" on 10/31/07. Two of these documents are noted as being deleted by MetLife.

The 11/26/02 Claim Note (ML 00177) states that normal duration for Wright's condition was 70 days, yet no guideline for this estimate was produced to counsel despite request.

The claim was given a "high liability review" as reflected in Claim Note dated 8/29/02 (ML 00180).

*MetLife Claim Guidelines*

Metlife has an extensive series of guidelines which set forth instructions for review and administration of disability claims. Portions of the guidelines were produced by Wright's counsel as part of the final appeal for benefits. These documents were produced as a result of requests made in *Palmiotti v. Metropolitan Life Ins. Co.*, 2006 WL 510387 (S.D.N.Y. 3/1/06). As part of *Palmiotti*, the affidavit of MetLife Employee, Rosemary Harmon, was taken on 3/10/05 (ML 02035 - 02045) confirming the use of the claim guidelines whose product was ordered on 3/9/05 (ML 02046 - 50). The produced guidelines at ML 02051 - 02175 reveal very substantive claims administration processes including claim investigation, claim management, denial/termination processes, among other areas (Summarized in final appeal letter at Exhibit A at pages 39 - 44) .

*The Plan*

The Summary Plan Description (ML00099) sets forth the Plan Administrator for the Plan

which is listed explicitly as KPMG Consulting, Inc.[2]

Throughout the entirety of the Plan, there is no delegation of discretionary authority to MetLife, but rather only to the Plan Administrator and "Other Plan Fiduciaries." (ML 00101) Further, MetLife is never assigned as a claims administrator in the Plan.

*Wright Disability Acknowledged by Insurer*

The Claim Note dated 12/16/04 (ML 00138) states that Wright's ability to perform a job was "not in question" and the only issue was whether or not the limitation exclusion applies.

Wright was described as unable to perform his past work (computer operator ML 00183) or any of his transferable skills in Claim Note dated 6/4/04 (ML 00156) which stated he could only perform four hours of work each day with limited repetitive hand use. The Claim Note dated 5/14/04 (ML 00159) stated Dr. Ross' position that Wright could work 0 hours/day. The Claim Note dated 2/10/04 (ML 00163 - 4) set forth that Wright was limited to 15 - 20 minutes of handling per hour with a daily maximum of 3 - 4 hours. Dr. Ross reported that Wright was unable to use his hands on 6/26/03 (ML 00168).

When the claim was approved for own occupation disability on 8/23/02 (ML 00180 - 1), the Claim Note states that the Wright has marked weakness in his hands and cannot grip or close his right hand fingers at all.

Wright was described by the insurer as motivated to return to work and not malingering in the Claim Note dated 5/15/03 (ML 00171).

*Medical Evidence Supporting Wright's Disability*

---

[2]KPMG subsequently renamed itself and became BearingPoint. Both names are synonymous for the Defendant.

Bilateral wrist MRI evidence dated 10/14/03 (ML 00342 - 6) confirmed that Wright suffers from tenosynovitis and joint erosions.

Long term treating rheumatologist A. Sylvia Ross' updated records (ML 00876 - 907) submitted with the final appeal dated 2/5/07 state that Wright continues to suffer from rheumatoid arthritis, continues to wear arm guards at night, takes humira with methotrexate, still has extremely poor tolerance of any kind of physical activity, suffers from stiffness of hips and feet, among other findings (ML 00876 - 90).

The records from family practitioner, Joseph W. Bruckert (ML 00908 - 17) reveal side effects to the anti-rheumatic medications taken by Wright as well as his concurrence with the diagnosis of rheumatoid arthritis.

Wright is taking multiple medications  including remicade, methotrexate, prednisone, bextra, enbrel (ML 00163), HCTZ, omeprazole, pyridoxine, isonazid, monopril (ML 00240, 00255), areva, medrol dosepak, humira, arthrotec, fosamax (ML 00923 - 6), benicar, wellbutrin, advicor, and nexium (ML 00918).  The medications result in side effects (taken from www.drugs.com at 00927 - 00981) which include insomnia, gastrointestinal upset, fatigue, dizziness, headache, weakness, joint pain, drowsiness, muscle pain, numbness, psychologic changes, among many others.

*Functional Capacity Evidence Supporting Wright's Disability*

Dr. Ross reported at that time that Wright was unable to use his hands at all.  The report from physical therapist Geert Audiens dated 8/2/06 (165 - 7) states that Wright has limitations with all functional upper extremity activities including perineal care, dressing, combing hair, washing axilla, working, eating with utensils, among others.

Dr. Ross reported on 6/5/03 (ML 00237) that Wright was only able to use a keyboard with his right hand.  She later reported that Wright could only drive short distances, and that Wright could not tolerate even minimal activity (Report on 10/15/03 at ML 00259).

*Functional Capacity Evidence Supporting Claimant Disability*

Dr. Ross reported (Claim Note dated 6/18/03 at ML 00169) that Wright suffers from pain and swelling in his hands, cannot use his hands, can sit/walk two hours, stand one hour on an intermittent basis, cannot climb/twist/bend/stoop/reach above shoulder or drive.

The physical capacity evaluation revealed that Wright was incapable "fingering" at that time and could handle only 15 - 20 minutes each hour and then only intermittently at 3 - 4 hour limit, and could sit only 1.5 hours with a maximum of 5.5 hours each day, and noting full day work endurance was an issue due to bed rest and deconditioning (Claim Note dated 2/10/04 at ML 00163).

The Attending Physician Statement completed by Dr. Ross and dated 7/16/02 (ML 00446 - 8) sets forth that Wright could sit 4 hours, sit 1 hour, walk 1 hour (sitting and walking only on an intermittent basis).  Wright cannot climb, reach about shoulder or operate a motor vehicle, lift up to 10lbs.,  cannot move his fingers hands, or push/pull.  Dr. Ross specifically stated that Claimant could not use his hand/arms at all.   Similar findings were iterated on 10/15/03 noting pain upon minimal activity (ML 00258 - 60).

The Physical Capacity Evaluation (ML 00290) limited Wright to 15 - 20 minutes at a time and 3 - 4 hours for an entire day and could not finger at all.

Wright underwent a Functional Capacities Evaluation on 1/14/06 (ML 00982 - 7, 1008)[3] under the supervision of Carlos Martinez, PT (C.V. at ML 1006 - 7). This testing revealed deficits including standing for extended periods, walking for extended periods, stair climbing, and repetitive sustainable activities. Physical examination revealed diminished range of motion in the cervical and lumbar spine as well as the upper and lower extremities. Wright tested into the light exertional category with that effort being unsustainable. He was only capable of part-time work (4 hours). Wright was further found to be unemployable with low improvement potential. No symptom magnification was identified. Wright was specifically found to be unable to sustain repetitive activities over an eight hour workday, specifically in regard to use of his upper extremities. Specific testing (Purdue pegboard) revealed below normative population average performance scoring with the Hand Tool Dexterity Test revealing a score in the 1st to 5th percentile, both culminating in the finding of lacking necessary manual dexterity to perform work.

Wright underwent neurocognitive evaluation under the supervision of Rick Parente (C.V. at 01013 - 27). The report dated 1/16/06 (ML 00988 - 1012)[4] sets forth the following findings concerning Wright:

- He is rather heavily medicated and in chronic pain

- Mild problems with spatial memory and fine finger dexterity

- Slow and limited hand skill

---

[3]Original sent to insurer in order as noted in bottom-centered numbering when submitted by Plaintiff's counsel. Defendants have imaged the report out of order.

[4]Original sent to insurer in order as noted in bottom-centered numbering when submitted by Plaintiff's counsel. Defendants have imaged the report out of order.

- Below average incidental memory

- Unable to process verbal or visual information quickly or efficiently causing problems with processing new information effectively

- Problems performing simple mathematical procedures rapidly indicating slowness of processing

- Poor academic fluency and inability to rapidly understand verbal and auditory information

- Wright would have difficulty returning to his former work and will have trouble working at all given his chronic pain and extensive use of medication.

*Statements Supporting Claimant Disability*

Wright's wife, Deborah, stated that (ML 00486 - 8) her husband suffers from unbearable pain and fatigue (requiring daily naps twice a day) which make it difficult for him to accomplish tasks, has been limited to two hours of desk work and must dictate notes, and is reliant on her and their sons to accomplish physical tasks.

Wright stated in the Claim Note dated 4/30/04 (ML 00161) that he wears arm/hand splints 24 hours a day and has to put large wads of cotton into gym socks to be placed over his hands so his fingers would not touch his bed. Wright stated that his wife assists him with dressing. Wright further stated that he had been unable to brush his teeth, shave or bathe himself in his responses to insurer questions dated 7/19/02 (ML 00451).

*Medical Documentation Supporting Claimant Disability*

The extensive medical authority cited below makes several points explicitly clear:

- **Serotesting is NOT the diagnostic standard for rheumatoid arthritis which is based on a much broader clinical diagnosis**

- **Up to 30% of patients with rheumatoid arthritis are seronegative yet still suffer the same symptoms as those who are serpositive**

8

- **Serotesting is not specific and results in many false positive and negative tests to the extent that similarly affected twins can have different results**

- **Serotesting has not predictive value of disease severity**

- **Medications taken to relieve rheumatoid arthritis will cause a patient to become seronegative**

- **Patients can change from seropositive to seronegative and back while still suffering from rheumatoid arthritis**

The gold standard of RA diagnosis is done by a physician in a clinical setting. The American Rheumatological Association (now American College of Rheumatology) developed the initial criteria in 1987 include seven findings as follows:

- Morning stiffness in and around the joints, lasting at least one hour before maximal improvement

- Soft tissue swelling or fluid (not bony overgrowth) observed by a physician, present simultaneously for at least 6 weeks in three joint areas

- Swelling of wrist, MCP or PIP joints for at least 6 weeks

- Simultaneous involvement of the same joint areas on both sides of the body

- Subcutaneous nodules over bone prominences, extensor surfaces or in juxta-articular regions, observed by a physician

- Detected by a method positive in fewer than 5% of normal controls

- Radiographic evidence including bony erosions or decalciification localized in or most marked adjacent to the involved joints.

A positive diagnosis for rheumatoid arthritis would include having four of the listed seven findings.  MacGregor, AJ and Silman, AJ.  Classification and epidemiology.  Hochberg, MC, et al. eds., *Rheumatology*. (Mosby 2003) 1: 757 - 8;  Schumacher, HR, ed.  *Primer on Rheumatic Diseases*. Arthritis Foundation (10th ed. 2003): 328 (ML 00544).  The accuracy of this information was confirmed by Dr. Ross in her letter dated 12/30/04 (ML 00545).

This is complicated by the fact that only 20% of RA patients with positive tests for blood rheumatoid factors (RF) will develop subcutaneous nodules.  Matteson, EL.  Extra-articular

9

features of rheumatoid arthritis and systemic involvement.  Hochberg, MC, et al. eds.,

*Rheumatology*. (Mosby 2003) 1:781 (ML 0162 - 43).

 RF factor exists in only 60 - 80% of RA patients, but has a low specificity as it can be

resultant of many other conditions including hepatitis, endocarditis, tuberculosis, among others.

Steiner, G.  Autoantibodies in rheumatoid arthritis.  Hochberg, MC, et al. eds., *Rheumatology*.

(Mosby 2003) 1: 834 (ML 0162 - 90).

The diagnosis of rheumatoid arthritis (RA) is largely dependent on the existence of a

characteristic pattern of clinical symptoms and signs.  There is no unique biochemical,

immunologic, or histologic abnormality defining the disease.  Rheumatoid factor (RF), C-

reactive protein, erythrocyte sedimentation all serve as indicators of disease activity.  RF serves

as confirmatory indicator in only 80% of RA cases. For example, nearly 80% of all systemic

lupus erythematosus (SLE) and 50% of mixed connective tissue disease patients will be RF

positive.  Other diseases such as inflammatory bowel disease, Sjögrens syndrome and

cryoglobulinemia may express extremely high RF titres. Detection of different isotypes of RF

are not possible utilizing generally available clinical laboratory tests.  Horwitz, CA.  Laboratory

diagnosis of rheumatoid diseases.  *Postgrad Med*. May 5,1980; 67: 193 - 203 (ML 01379 - 85);

Persellin, JE.  Diagnosis of rheumatoid arthritis: Medical and laboratory aspects. *Clin Ortho Rel

Res*.  April, 1991; 265: 73 - 82 (ML 01360 - 9).

RF testing has limited clinical utility as it has significant limitations in sensitivity,

specificity, and predictive value.  Shemerling and Delbanco, TL.  The rheumatoid factor: An

analysis of clinical utility.  *Am J Med*.  November, 1991; 91: 528 - 534 (ML 01433 - 7).  A

survey of testing revealed that most RF tests were not useful since a majority represented false

positive results.  Shmerling, RH and Delbanco, TL.  *Arch Intern Med*. December, 1992; 153(16): 1937 - 8 )ML 01438 - 41).  A criticism of this study noted that many of the positive RF tests were present in persons without joint complaints, only serving to underscore the presence of RF in persons other than those with RA revealing its low sensitivity.  Cusato, K, et al.  The utility of the rheumatoid factor.  *Arch Intern Med*.  August 23, 1993; 153: 1937 - 8 (with original author response following)(ML 01431 - 2).  There are multiple cross reactive IgM rheumatoid factor (RF) idiotypes.  Non-RA RF positive sera has been found in various patient populations.  Kouri, T, et al. Occurrence of two germline-related rheumatoid factor idiotypes in rheumatoid arthritis and in non-rheumatoid seropositive individuals.  *Clin Exp Immunol*.  1990; 82: 250 - 6 (ML 01353 - 9).

Tests for RF, antinuclear antibodies and other antibodies are generally negative. Occasionally, positive tests are seen for rheumatoid factor and antinuclear antibodies, which are present in low titre and generally transient.  Although these may be markers of severe disease, they may also represent repeated testing on previously test-negative patients. Esdaile, JM.  Adult Still's disease.  Hochberg, MC, et al, eds.  *Rheumatology* (Mosby 2003); 1: 796 (ML 01644 - 51).

In using the disease modifying antirheumtic drug (DMARD) enternacept, RF levels decline 36% on average in RF positive patients and had an inconsistent effect on anti-CCP antibodies while causing an increase in inflammatory markers ESR and C reactive protein.  Chen, HA, et al.  The effect of entanercept on anti-cyclic citrullinated peptide antibodies and rheumatoid factor in patients with rheumatoid arthritis.  *Ann Rheum Dis*.  2006.  65: 35 - 9 (ML 01315 - 21).

RF testing has only 66% sensitivity, but when combined with anti-CCP testing is far

more accurate.  Even then, there is no prognostic variable for disease severity. Cannella, AC and O'Dell, JR.  Early rheumatoid arthritis: Pitfalls in diagnosis and review of recent clinical trials. *Drugs*.  2006; 66(10): 1319 - 1337 (ML 01522 - 40).

Studies concerning use of DMARDs (disease modifying antirheumatic drugs) have been predicated by disease activity and not RF factor presence.  Maradit-Kremers, H, et al. Patient, disease, and therapy-related factors that influence discontinuation of disease-modifying antirheumatic drugs: A population-based incidence cohort of patients with rheumatoid arthritis. *J Rheumatol*.  2006; 33: 248 - 55 (ML 01422 - 49).   For example, 33% of patients had to discontinue use of infliximab due to side effects, lack of efficacy or infections although showing a 50% response rate in terms of RF seronegativity. Kapral, T, et al. Methotrexate in rheumatoid arthritis is frequently effective, even if re-employed after a previous failure.  *Arth Res Ther*. 2006; 8: R46 (online publication)(ML 01456 - 64).

Testing assays for AKA and APF (and possibly anti-RA33) yield greater specificity for RA severe disease types than RF.  Aho, K, et al.  Marker antibodies of rheumatoid arthritis: Diagnostic and pathogenetic implications.  *Sem Arthritis Rheum*.  June, 1994; 23(6): 379 - 87 (ML 01392 - 400).

Seronegative (negative IgM rheumatoid factor) RA patients comprise up to 30% of the total population.  Both seropositive and seronegative RA are associated with HLA-DR4 antibodies and may share the same immunogenetic bases.  The genetic difference is so minimal that even monozygous twins will show discordant RF seropositivity.  Panayi, GS, et al. Seronegative and seropositive rheumatoid arthritis: Similar diseases.  *Br J Rheumatol*.  1987; 26: 172 - 80 (ML 01370 - 8); Husby, G and Gran, JT.  What is seronegative rheumatoid arthritis?

12

*Scand J Rheum*. 1988; Suppl. 75: 269 - 71 (ML 01370 - 8); Al-Jarallah, KF, et al. Seronegative rheumtoid arthritis and HLA-DR4. *J Rheumatol*. 1994; 21: 190 - 3(ML 01346 - 9; Vehe, RK, et al. Erosive rheumatoid factor negative and positive rheumatoid arthritis are immunogenetically similar. *J Rheumatol*. 1994; 21:194 - 6 (ML 01350 -

Patients with initial positive RF who seroconvert to negative RF within the first year of follow-up testing did not indicate a particularly good long-term prognosis. Tuomi, T, et al. Significance of rheumatoid factors in an eight-year longitudinal study on arthritis. *Rheumatol Int*. 1988; 8: 21 - 6 (ML 01386 - 91).

There has been a call for an end to the RF positive/negative differentiation due to technical obstacles in testing, fluctuation of RF level and presence of "hidden" RF (sera containing RF although not detectable by conventional laboratory techniques). More than 2/3 or more RA cases in communities will be seronegative, contrary to the overall 1/3 cross section presence in the total population. Changing the diagnostic consideration to include evidence of more than one antibody marker (adding AKA and/or APF) to the American College of Rheumatology disease classification would be more indicative of an underlying immunological process. Kimmo, A and Kurki, P. Seropositive versus seronegative rheumatoid arthritis – Time for a new definition. *J Rheumatol*. 1994; 21: 388 - 9(ML 01425 - 7). The historical reason for creating a positive RF including in the RA definition was to differentiate RA from gouty arthritis. Given the large number of seronegative patients, the designation is "devoid of meaning." The current cutoff point for RF positivity may be too low as the RF producing cells may be highly avid and specific in light of the same immunogentic basis for RF positive and negative cells. Buchanan, WW and Singal, DP. Seronegative rheumatoid arthritis: Tell it as it

is. *J Rheumatol*. 1994; 21: 391 - 3(01428 - 30). It is believed that the initial over-reporting of RF sensitivity (90% as opposed to subsequent findings of 26 - 60%) have led to a bias of RF positive patients to be classified as more severe. False positive RF tests occur in 3 - 25% of the population and only show a predictive value for rheumatic disease of 24 - 34%. Schur, PH and Shmerling, RH. Laboratory tests in rheumatic disorders. Hochberg, MC, et al. eds., *Rheumatology*. (Mosby 2003) 1:207 (ML 01225 - 33).

Nearly 80% of patients will become RF negative while treated with infliximab and methotrexate, but anti -CCP antibodies titre will initially decrease then increase back to baseline measurements. Bobbio-Pavllavicini, F, et al. Autoantibody profile in rheumatoid arthritis during long-term infliximab treatment. *Arthritis Res Ther*. 2004; 6: R264 - R272 (ML 01471 - 79). Despite decreasing RF during infliximab treatment, anti-CCP antibodies remained. Caramaschi, P, et al. Antibodies against cyclic citrullinated peptides in patients affected by rheumatoid arthritis were present before and after infliximab treatment. *Rheumatol Int*. 2005; 26: 58 - 62(ML 01492 - 6); Atzeni, F, et al. Adalimumab clinical efficiency is associated with rheumatoid factor and anti-cyclic citrullinated peptide antibody titer reductions: a one-year prospective study. *Arth Res Ther*. 2006; 8: R3 (online publication)(ML 01497 - 504).

The full medical citations concerning aspects of rheumatoid arthritis, its diagnosis, and how chronic pain affects patients is summarized in the final appeal submitted on 2/5/07 (ML 02221 - 2244) with extensive refareenced medical literature located at (ML 01028 - 02018).

Dr. Ross' letter dated 12/7/04 (ML 00350) confirmed that Wright suffers from rheumatoid arthritis as diagnosed clinically, in this case by joint erosion. 30% of the rheumatoid arthritis patients in her practice do not have a positive rheumatoid factor, but this absence does

not exclude the diagnosis. Wright's treatment with aggressive Disease Modifying Anti-Rheumatic drugs decrease antibodies in the blood stream and make the Rheumatoid Factor (an antibody) negative. Further, there are many false positive Rheumatoid Factor tests.

The medical evidence makes it clear that the medication taken by the Clamant for his condition will prevent a seropositive result due to lowering of antibodies, but does not relieve his disabling condition. (See Claim Note with Dr. Silva Report dated 12/14/04 (ML 00141), 12/14/04 (ML 00143), and 12/1/04 (ML 00146).

A second rheumatologist and Clinical Professor of Medicine, Rex McCallum, in his report dated 12/20/04 (ML 00547 - 8) confirmed Claimant's diagnosis of serologically negative rheumatoid arthritis via the clinical symptoms of tenosynovitis and joint erosion.

*Claim Denial*

The Claim Note on 4/25/07 (ML 00115 - 6) states that the appeal was upheld "on the basis of the lack of objective evidence" of seropositive arthritis. This was the same reason set forth in the previous claim denial on 6/23/05 (Claim Note at ML 00127).

The claim denial following the 2/5/07 appeal (ML 02215 - 58) by this counsel was undertaken not as a "courtesy" as stated by Defendants, but as a matter of necessity given the fact that the proper designated party never administrated the claim or the appeal. It is that point that MetLife's "courtesy" ended with this Defendant being warned on 4/6/07 (ML 02212) as it failed to timely respond to the appeal.

**STATEMENT OF DISPUTED FACTS:**

Defendants state that they undertook a "courtesy appeal" and issued their "courtesy" denial on 5/11/07 (Defendant's Summary Judgement Memo. at ¶ 35). Wright asserts this action

15

was undertaken due to the improper denial issued previously and was a continuation of their failure to provide a full and fair review as will be explained subsequently.  There is no provision in the plan for a "courtesy" appeal.

**ARGUMENT:**

This Matter is Proper for Disposition by Summary Judgement.

Wright adopts Defendants' citations stating that this matter should be decided by Summary Judgment.

Wright's Dual Claims under 29 U.S.C. § 1132(a)(3) and 1132(a)(1)(B) Are Properly Asserted.

Defendants have raised nothing more than a "red herring" issue with their argument that 29 U.S.C. § 1132(a)(3) and § 1132(a)(1)(B) claims may not be asserted together.  The Defendants cite directly to *Clark v. Feder, Semo & Bard, P.C.,* 527 F.Supp.2d 112, 116 (U.S.Dist.DC 2007) which clearly states a breach of fiduciary duty claim under § 1132(a)(3), cannot stand where the claimant has an adequate remedy through the claim of benefits under § 1132(a)(1)(B) .  This matter concerns a claim for benefits as is made abundantly clear in the complaint which at no time request relief for a breach of fiduciary duty.  Therefore, Defendants are clearly mistaken in requesting both counts to be dismissed on basis of an alleged failure of a § 1132(a)(3) claim and have no authority for this position.

Defendants failed to cite to the ample persuasive circuit case authority supporting the joint assertion of a 29 U.S.C. §1132(a)(3) and 1132(a)(1)(B) claims.  Many jurisdictions have held that an action under 29 USC § 1132(a)(3),  the remedial section of ERISA, is available as an independent action allowing for the enforcement of federal or state statues or laws through 1132(a)(1)(B).  *Conley v. Pitney Bowes*, 34 F.3d 714 (8th Cir. 1994); *Buce v. Allianz Life Insur.*

*Co.*, 247 F.3d 1133; *Harris v. The Epic Group*, 357 F.3d 822 (8th Cir. 2004); *Juliano v. The Health Maintenance Organization of New Jersey, Inc.*, 221 F.3d 279, 289 (2nd Cir. 2000); *Plumb v. Fluid Pump Services*, 124 F.3d 849, 861 (7th Cir. 1997).

Defendants conveniently ignored this extensive case authority in briefing their case in addition to their mischaracterization of pertinent case authority from this Court which in no way commands a dismissal of both counts due to failure of one. This course of conduct of failing to cite or acknowledge contrary authority occurs throughout Defendants' Summary Judgment Memorandum.

The Plan Fails to Make a Proper Designation of Discretionary Authority Resulting in *De Novo* Standard of Review.

A fiduciary must be named in the plan instrument pursuant to mandatory statutory requirements. ERISA §402, 29 U.S.C. § 1102 provides:

> (1) Every employee benefit plan shall be established and maintained pursuant to a written instrument. Such instrument shall provide for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan.

> (2) for purposes of this title, the term"named fiduciary" means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person is an employee organization with respect to the plan or (B) by such a employer and such an employer organization acting jointly.

Thereafter, the "named fiduciary" can designate a non-named fiduciary to carry out certain duties if the plan instrument "expressly" provides a procedure for identifying such a fiduciary. ERISA §405(c)(1), 29 USC §1105(c)(1). Furthermore, any naming of a fiduciary must be "described" in the plan. ERISA §402(b)(2), 29 USC §1102(b)(2). The delegation methods specified in ERISA §§402 and 405(c)(1) are the only delegation methods specified.

These statutes are mandatory, not permissive in nature.  See, *Birmingham v. Sogen-Swiss Int'l.*

*Corp. Retirement Plan*, 718 F.2d 515, 522 (2d Cir. 1983).

A "named fiduciary" may delegate its responsibilities.  ERISA  § 405(c)(1), 29 USC §

1105(c)(1) which reads:

> The instrument under which a plan is maintained may expressly provide
> for procedures (A) for allocating fiduciary responsibilities (other than
> trustee responsibilities) among named fiduciaries, and (B) for named
> fiduciaries to designate persons other than named fiduciaries to carry out
> fiduciary responsibilities...under the plan.

The binding case authority has been mischaracterized by the Defendants and fully

supports Wright's position that the *de novo* standard of review should be applied due to a failure

to delegate discretionary authority properly.

Although there is no "magic word" or language required to grant the administrator

discretionary authority, the conveyance of that authority to that administrator must be clear.

*Becker v. The Weinberg Group, Inc Pension Trust*, 473 F. Supp.2d 48, 61 (D.D.C. 2007) citing

*Block v. Pitney Bowes, Inc.*, 952 F.2d 1450, 1452, 1454 (D.C.Cir. 1992).  This is buttressed by

the holding in *Constantino v. Washington Post Multi-Option Benefits Plan*, 404 F.Supp.2d 31, 38

- 9 (D.D.C. 2005) that:

> To properly grant discretion under ERISA, the delegation of discretionary
> authority must be made by a plan document, it must be express, and it
> must be to a named fiduciary or its delegate [including that] (1) the
> instrument under which a plan is maintained may expressly provide for
> procedures (A) for allocating fiduciary responsibilities...among named
> fiduciaries, and (B) for named fiduciaries to designate persons other than
> named fiduciaries to carry out fiduciary responsibilities...under the plan.
> Id. at 38

In the *Constantino* case, the court ruled the applicable plan "clearly granted discretionary

authority to the Post."  *Id*. at 39.  In this case, the plan names the administrator, KPMG (now

BearingPoint).  See Also, *Connors v. Cedar Coal Co.*, 1991 WL 102640 at *4, fn3 (D.D.C. 6/4/91) citing *Brown v. Ampco-Pittsburgh Corp.*, 876 F.2d 546, 550 (6th Cir. 1989)

In particular, and quite relevant, is the holding rendered in *Crummett v. Metropolitan Life Ins. Co.*, 2007 WL 2071704 (D.D.C. 7/16/07) which involved not only the same defendant, but also the same law firm.  The *Crummett* case involved a Plan issued by Metlife which stated:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to benefits in accordance with the terms of the Plan.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.  *Id.* at *1.

Where a plan provided that the benefits committee "may" delegate its authority to outside consultants or companies and actual delegation must take place results in *de novo* review. *Fitts v. Federal National Mort. Assn. and Unum Life Ins. Co. of Am.*, 236 F.3d 1, 13 (U.S. Ct. App. D.C. 2001)  Where a plan administrator did not have occasion to make a determination of eligibility as required under the benefits plan, the *de novo* standard of review was appropriate.  *Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388 (5th Cir. 1998).   Further, any such delegation when made must be done so clearly to holder of the plan.  *Chimmy v. Prudential Ins. Co.*, 2004 WL 2647615 (N.D. Ill.  Nov. 19, 2004).

There is substantial persuasive case authority which supports the position that the failure to follow plan documents results in *de novo* review. Where discretionary authority is reserved it must be exercised by the designated person or entity, not someone else.  *Johnson v. Unum Life Insur. Co. of Am.*, 329 F.Supp.2d 161, 170 - 1 (2004) citing *Rodriguez-Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 584 (1st Cir. 1993); *See Also*; *DiGregorio v.*

*PriceWaterhouseCoopers Long Term Disability Plan*, 2004 WL 1774566 (D.Mass) at \*16 citing *Mario v. P&C Food Mkts., Inc.*, 313 F.3d 758, 762 (2nd Cir. 2002).

An unauthorized party undertaking review of a claim results in a *de novo* standard of review. *Sharkey v. Ultramar*, 70 F.3d 226 (2nd Cir. 1995);  *Geddes v. United Staffing Alliance Employee Medical Plan*, 2005 WL 1414268 (D. Utah March 23, 2005).

Unless plan documents unambiguously grant an administrator or fiduciary authority, power, or discretion to determine eligibility or to construe plans of the term, then the standard of review is *de novo*. *Murch v. Prudential Welfare Benefit Plan*.  2006 U.S.Dist.LEXJS 32613 (W.D.Wash. May 23, 2006) citing *Sandy v. Reliance Life Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000).

Where a plan fails to comply with plan requirements, *de novo* review is applicable. *Sanford v. Harvard Industries, Inc.*, 2001 U.S. App. Lexis 19022 (6th Cir.)[the defendant employer failed to follow procedures in the collective bargaining agreement and failed to give notice as required before revocation of Plaintiff's benefits];  *Nelson v. EG&G Energy Measurements Group, Inc.*, 37 F.3d 1384, 1389 (9th Cir. 1994) [A miscalculation of savings plan contributions in violation of the benefits plan].

The standard for making a delegation of authority was made clear in *Chimmy v. Prudential Inc. Co.*, 2004 WL 2647615 (N.D.Ill.) at \*1 which held that a proper delegation of authority to an administrator required that plan make that delegation sufficiently clear to the holder of the plan.  *See Also*, *Gallagher v.  Reliance Stand. Life Insur. Co.*, 305 F.3d 264 (4th Cir. 2002) citing *Sandy v. Reliance Standard Life Ins. Co.*, 222 F.3d 1202, 1207 (9th Cir. 2000); *McKeehan v. Cigna Life Insur. Co.*, 344 F.3d 789 (8th Cir. 2003).

20

More generally, there is a wealth of case authority supporting the premise that where there is no clear delegation of discretionary authority, then the abuse of discretion standard is not applicable. *Herzberger v. Standard Ins. Co.*, 205 F.3d 327 (7th Cir. 2000); *Kinstler v. First Reliance Stand. Life Ins. Co.*, 181 F.3d 243, 251 - 2 (2d Cir. 1999); *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1089 - 90 (9th Cir. 1999)(en banc); *Brown v. Seitz Foods, Inc. Disability Benefit Plan*, 140 F.3d 1998, 1200 (8th Cir. 1998); *Bounds v. Bell Atlantic Enterprises Flexible Long-Term Disability Plan*, 32 F.3d 337, 339 (8th Cir. 1994); *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 87 -9 (4th Cir. 1996); *See Also*, *Gray v. Hartford Life and Acc. Ins. Co.*, 2004 WL 2672842 (M.D.Fla.) citing *HCA Health Services of Georgia, Inc. v. Employers Health Coverage Co.*, 240 F.3d 982, 993 (11th Cir. 2001).

In fact, Defendants improperly point to *Ruiz v. Continental Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2004). This holding in this case set forth a two part analysis. The first part is whether the defendant is a fiduciary. If so, then the second part is whether the fiduciary is granted sufficient authority under the terms of the plan. In this case, there is no granting of discretionary authority to Metlife who has made all the claims decisions. Therefore, Defendants' reliance on this case is misfounded.

It is absolutely clear that discretion was vested in the named plan administrator, KPMG (now BearingPoint). There is no evidence of any plan provision allowing for granting of discretion to Metlife nor any evidence of any granting of such discretion or even a request by MetLife for such a grant of discretion in order to review the subject claim.

Even where a clear delegation is made, the delegation of authority must expressly grant discretion and cannot use ambiguous terms such as "determine." *Doley v. Prudential Ins. Co. of*

*Am.*, 2008 WL 131192 (D.D.C. 1/8/08).

There is no clear delegation of discretionary authority in the summary plan document to MetLife. The law is very specific that there must be a clear delegation whereas Defendants can only point to general language concerning Plan Fiduciaries which, under the extensive law cited, is clearly insufficient to grant discretion to MetLife's claim denials in this case. The named Plan Administrator was KPMG who failed to handle the claim in any manner. For this reason, the *de novo* standard of review should be applied.

MetLife's own conduct during the administrative appeals in these cases undermines its own position. Metlife has reaffirmed the Summary Plan Description which names KPMG as the Plan Administrator (ML 0099). Despite having written the Plan and conducting both application and appeal reviews under the Plan, MetLife took the position that the only way for a claimant to obtain the plan is via a request to the Plan Administrator. Therefore, given this conduct, MetLife has acknowledged that it had no duty to the Wright, a plan fiduciary. Therefore, Metlife cannot in good faith state it is a fiduciary at this time for the purpose of exercising discretion and the *de novo* standard of review should be applied.

Defendants Improperly Rely on a Certificate of Insurance to Delegate Discretion.

Rather than relying on any language set forth in the Summary Plan Document which runs 101 pages (ML 1 - 101), Defendants have chosen to rely on another document entitled "Statement of ERISA Rights"(ML 00102) which contains only general fiduciary language and still fails to set forth specific discretionary authority to MetLife who has undertaken all the claim review in this case.

Any delegation of authority to a third party must be expressly allowed in the plan.

22

*Robertson v. Broadspire Nat'l. Servs.*, 2006 U.S.Dist. LEXIS 75247 (D.Ore. October 10, 2006). The plan must expressly allow for the delegation, including (1) explanation of the specific procedures that must be followed in completing the delegation; and (2) an express delegation between the delegator and delegates. *Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283 - 5 (9th Cir. 1990); *Shane v. Albertson's, Inc. Employees' Disability Plan*, 381 F.Supp.2d 1196 (C.D.CA 2005); *Sanders v. CNA Group Life Assur. Co.*, 322 F. Supp.2d 1142 (D.Or. 2004); *Geddes v. United Staffing Alliance Emple. Med. Plan*, 2005 U.S.Dist. LEXIS 4758; 34 Employees Benefits Cas. (BNA) 2691, (D.UT 3/23/05); *Winterstein v. Stryker Corp. Gorup Life Ins. Plan*, 2005 U.S. App. LEXIS 25710 (9th Cir. 10/17/05); *Oasis Treatment Ctr. V. Travelers*, 238 F.3d 430, 2000 U.S.App.LEXIS 22740 (9th Cir. 9/7/00).

It has been held that extra-plan documents cannot expand a plan administrator's discretion when the plan itself bestows no such discretion. *Schwarrtz v. Prudential Ins. Co. of Am.*, 450 F.3d 697 (7th Cir. 2006); followed in *Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 871 - 2 (N.D.Ill. 2006). This exact reasoning has been followed in several other circuits including *Shaw v. Connecticut General Life Ins. Co.*, 353 F.3d 1276 (11th Cir. 2003); *Grosz-Salomon v. Paul Revere Life Insur. Co.*, 237 F.3d 1154 (9th Cir. 2001); *Murphy v. Int'l. Bus. Machs. Corp.*, 23 F.3d 719, 721 (2nd Cir. 1994).

Similarly, a service agreement does not serve as evidence of delegation of authority unless the delegation is continued in the benefit plan itself or in a summary plan description. 29 U.S.C. § 1105(c); *Crider v. Highmark Life Ins. Co.*, 2006 U.S.Dist.LEXIS 74989 at *5 - 6 (W.D.Mich. October 16, 2006).

<u>*De Novo* Standard of Review Defined.</u>

23

Based on the facts and law, this case should be decided under the *de novo* standard of review. The origin of the applicable standard of review was set forth in *Firestone Tire & Rubber Co. v. Bruch*, 489. U.S. 101 (1989) in which the Supreme Court plainly stated:

> if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "factor in determining whether there is an abuse of discretion."  *Id*. at 115 quoting Restatement (Second) of Trusts § 187 (1959).

Where there is no discretion afforded to a plan fiduciary, the *de novo* standard of review will be applicable.  *De Novo* review permits a district court to consider the issue of whether a plan beneficiary is entitled to benefits as it had not been previously decided.  Therefore,  no deference afforded to an administrator's claim decision.  *Mobley v. Continental Cas. Co.*, 405 F.Supp.2d 42 (D.D.C. 2005).

The Coverage Provided by Defendants for Rheumatoid Arthritis is Illusory.

The testimony from Dr. Ross in addition to the voluminous medical literature presented reveals that serotesting for rheumatoid arthritis is not the correct diagnostic tool and  is a very inaccurate indicator for the disease.  Seropositivity is only one of seven official indicators of rheumatoid arthritis.  Seropositivity varies from individual to individual and time to time. Further, there is no correlation to a seropositive test to disease severity.  Even worse, many people taking appropriate medication for rheumatoid arthritis will be rendered seronegative although still suffering from many disease complications.

Defendants' insistence on this ambiguous standard leads to an illusory result as it excludes most patients with rheumatoid arthritis from receiving disability benefits despite suffering from truly disabling effects of the disease.  The logic embraced by the Defendants leads to a very disturbing result.  For a claimant to become eligible for coverage, the claimant

24

would be required to cease taking the drugs which are needed to preserve his/her health.  In doing so,  a claimant would suffer greater destruction to his/her body during the medication weaning-off their for months in hope of creating seropositive test to continue receiving long term disability benefits.  Such an absurd result could not be intended or permitted.

The ERISA case law concerning illusory policy is very clear.  The purpose of ERISA is to make "the private pension promise...real rather than illusory."  *Kaszuk v. Bakery and Confectionary Union and Industry Int'l. Pension Fund*, 1985 WL 2183 at *5(N.D.Ill. July 15, 1985) citing H.Rep. 93-533.  ERISA is to be liberally construed in favor of employer benefit fund participants.  *Kross v. Western Electric Co.*, 701 F.2d 1238, 1242 (7th Cir. 1983) citing H.R.Rep. 93-533.

A claim decision may not violate the substantive or procedural requirements of ERISA.  This includes attracting employees to a job with the promise of benefits which, when they are claimed, turn out to be illusory.  *King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 1008 - 9 (8th Cir. 2005); *Bassiri v. Xerox Corp.*, 292 F. Supp.2d 1212, 1222 (C.D.Ca. 2003).   ERISA expressed purpose  includes protecting "the interests of participants in employee benefit plans" and establishing standards of conduct, responsibility, and obligation for fiduciaries"of employee benefit plans.  29 USC § 1001(b)(2005); *Blessing v. J.P. Morgan Chase & Co.*, 394 F.Supp.2d 569, 584 (S.D.N.Y.  2005).  An illusory promise fails to comport with this requirement.

A plan should be construed as a whole, and the specific language of each provision should be interpreted in the context of the whole.  *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 93 (3d Cir. 1992).  The provisions of an ERISA plan should be construed so as to render none nugatory and avoid illusory promises. *Crosswhite v. Reliance Standard Life Ins. Co.,* 259 F.

Supp.2d 911, 917 (E.D.Mo 2003) citing *Wilson v. Prudential Ins. Co. of Am.*, 97 F.3d 1010,

1013 (8th Cir. 1996); *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98 , 103 (5th Cir. 1993)("A

court should not interpret a policy to leave specific provisions without meaning or effect.")

*Carr v. First Nationwide Bank*, 816 F.Supp. 1476, 1493 (N.D.Cal. 1993).  Any interpretation

which gives a reasonable, lawful and effective meaning to all terms is preferred to one which

leaves any part unreasonable or no effect. *Kemmerer v. ICI  Ams., Inc.*, 842 F.Supp. 138, 143

(E.D.Pa. 1994) citing *Musto v. Am. Gen. Corp.*, 861 F.2d 897, 906 (6th Cir. 1988) ; *Restatement*

*(Second) of Contracts*, § 203.   If an ambiguity exists, extrinsic evidence may be considered.

*Howe v. Varity Corp.*, 1989 WL 98895 at *12 (S.D.Iowa July 14, 1989) citing *Anderson v. Alpha*

*Portland Inds., Inc.*, 836 F.2d 1512, 1517 (8th Cir. 1988).

State-based law cases are similarly supportive of Wright's position that the exclusionary

plan language is illusory.  In interpreting a contract, the fundamental inquiry is to determine the

intent of the parties at the time of the parties entered into the agreement.  *Manchester Knitted*

*Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industries Fund*, 967 F.2d 688, 694

citing *Post Machinery Co. Inc. (MA) v. Tanges*, 705 F.Supp. 55, 59 (D.N.H. 1989).  A contract is

to be interpreted so as "to give effect to te expressed intentions of the parties." *Id*. citing

*Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2nd Cir. 1985)(internally citing

*Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171 - 2, 350 N.Y.S.2d 895,

898, 305 N.E.2d 907, 910 (1973); *Mallad Construction Corp. v. County Federal Savings & Loan*

*Assn.*, 32 N.Y.2d 285, 291, 344 N.Y.S.2d 925, 930, 298 N.E.2d 96, 101 (1973); *Airco Alloys*

*Division, Airco, Inc. v. Niagara Mohawk Power Corp.*, 76A.D.2d 68, 77, 430 N.Y.S.2d 179,

1984 (4th Dep't 1980); 4 S.Williston, *Williston on Contracts* § 600 (3d ed. 1961).

A contract is to be interpreted in a manner which gives reasonable effect to its terms and conditions. *Manchester Knitted Fashions, Inc., supra* at 694 citing *Merrill Lynch Commodities v. Richal Shipping Corp.*, 581 F.Supp. 933, 939 n.14 (S.D.N.Y. 1984).

It is settled rule of contract interpretation that contract language should not be interpreted to render the contract promise illusory or meaningless. *Retail Clerks Union Int'l. Assn. Local No. 455, AFL-CIO v. National Labor Relations Board*. 510 F.2d 802 (D.C.Cir. 1975); citing *Ludwig Honold Mfg. Co. v. Fletcher*, 405 F.2d 1123, 1131 (3d Cir. 1969); *Cordovan Assoc., Inc. v. Dayton Rubber Co.*, 290 F.2d 858, 861 (6th Cir. 1961); *Gray v. Travelers' Indemnity Co.*, 280 F.2d 549, 552 (9th Cir. 1960); *J.C.Millet Co. v. Distillers Distributing Corp.*, 258 F.2d 138, 142 (9th Cir. 1958); See Also, *Caglioti v. District Hospital Partners, LP*, 933 A.2d 800 (DCA 2006).

An illusory contract is one in which one party "gives consideration that is so insignificant that an actual obligation cannot be imposed." *Amfac Resorts, LLC v. U.S. Dept. of the Interior*, 142 F.Supp.2d 54, 79 citing *Woll v. United States*, 45 Fed. Cl. 475 (1999). A contract is to be construed as meaningful and not illusory. *Manchester Knitted Fashions, Inc. v. Amalgamated Cotton Garment and Allied Industries Fund*, 967 F.2d 688, 694 citing *Cofman v. Acton Corp.*, 958 F.2d 494, 497 (1st Cir. 1992).

Alternatively, an illusory promise is defined as "an expression cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has committed himself not at all. Calamari & Perillo, *Contracts*, § 4-12: 228 (3rd ed. 1987).

A colorful description of an illusory contract was set forth in *Ulliman Schutte Construction, LLC v. Emerson Process Management Power & Water Solutions*, 2006 WL 1102838 (D.D.C.) citing *Harrington v. Harrington*, 365 N.W.2d 553, 555 (N.D.1985),

describing it as "an expression cloaked in promissory terms, but which, upon closer examination, reveals that the promisor has not committed himself in any manner.  In other words, an illusory [contract] is a [contract] that is not a [contract].  The [contract] is an illusion."

The statements by the treating and consulting physicians in addition to the extensive medical literature all support that the Defendants have chosen an improper standard for determining whether claimants suffering from rheumatoid arthritis should be compensated with disability benefits.  It is very evident that the Defendants carefully chose an illusory standard so as to exclude many claimants who would otherwise be entitled to their long term disability benefits.  The law and facts concerning illusory promises dictate that this conduct cannot be allowed.

Defendants Bear the Burden of Persuasion Concerning Policy Exclusions.

The burden rests on the defendant to demonstrate how a specific policy exclusion is applied to deny benefits.  *Moore v. Blue Cross and Blue Shield of the Nat'l. Capital Area and CapitalCare, Inc.*, 70 F.Supp.2d 9, 25 (DC Cir. 1999) citing *Horton v. Reliance Standard Life Insur. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); *McGee v. Equicor-Equitable HCA Corp.*, 953 F.2d 1192, 1205 (10th Cir. 1992).   *See Also*, *Jenkins v. Montgomery Inds., Inc.*, 77 F.3d 740, 743 (4th Cir. 1996);  *Sunex Int'l, Inc. v. Travelers Indemnity Co. of Illinois*, 185 F.Supp.2d 614, 617 (D.S.C. 2001).  If an insurer claims that a specific policy exclusion applies to deny the insured benefits, the insurer generally must prove the exclusion prevents coverage. *McClurg v. Hartford Life and Accid. Ins. Co.*, 2006 WL 2801878 (M.D.Fla. September 28, 2006) *Crosswhite v. Reliance Standard Life Ins. Co.*, 259 F.Supp.2d 911, 918 (E.D.Mo. 2003);  *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998); *Farley v. Benefit Trust*

*Co.*, 979 F.2d 653, 658 (8ᵗʰ Cir. 1992).

General principles governing exclusion clauses in an insurance policy are no less applicable to an insurance policy governed by ERISA, and thus exceptions are given strict construction, must be specific and clear, and are not to be extended by interpretation or implication. *Critchlow v. First Unum Life Ins. Co.*, 378 F.3d 246 (2ⁿᵈ Cir. 246) citing 29 USCA § 1001, et seq.

The Policy Terms Are Ambiguous.

Should the plan be deemed ambiguous in any way, the doctrine of *contra preferentum* will be applied which requires that the terms of the contract be interpreted against, the drafter. *Fitts v. Unum Life Ins. Co. of Am.*, 2007 WL1339474 (D.D.C. 5/7/07); *Germany v. Operating Eng'rs Trust Fund*, 789 F. Supp. 1165, 1170 (D.D.C. 1992). If policy language is determined to be ambiguous or otherwise susceptible of more than one meaning, the court's duty is to apply the plain meaning of words and phrases used to facts before it and is without any authority to rewrite the policy or add meaning to it that is not there. *Cary Canada, Inc. v. Columbia Cas. Co.*, 940 F.2d 1548 (D.C.Cir. 1991).

There is little doubt that Defendants' attempt to manipulate the definition of "rheumatoid arthritis" is ambiguous at best and should be construed against them.

MetLife Repetitively Improperly Denied the Claim for Lack of "Objective Evidence".

It is improper to deny a claim based on a lack of "objective" evidence where the Plan has no requirement that "objective" evidence be provided and to insist on such is an abuse of discretion. *Baker v. Metropolitan Life Insur. Co.*, 2006 U.S.Dist.LEXIS 92556 (M.D. Tenn. December 20, 2006); *Burt v. Metropolitan Life Insur. Co.*, 2005 U.S.Dist.LEXIS 22810

(N.D.Ga. September 16, 2005) citing *Durr v. Metropolitan Life Insur. Co.*, 15 F.Supp.2d 205,

212 ("administrators and fiduciaries are prohibited from adding a term or extra requirement into

an insurance policy that is no expressly part of it."); *May v. Metropolitan Life Ins. Co.*, 2004

U.S.Dist.LEXIS 18486 (N.D.Cal. September 9, 2004); *Duncan v. Continental Ca*s. *Co*., Civ. No.

96-2421, 1997 WL 88374, *4 (N.D.Cal. 1997)(insurance company could deny claim based on

lack of objective medical evidence where policy did not refer to such a requirement);  *Hunt v.*

*Metropolitan Life Insur. Co.*, 2005 U.S.App.LEXIS 21428 (8th Cir. October 4, 2005) citing

*House v. The Paul Revere Life Insur. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001)(abuse of

discretion to deny benefits based on absence of objective evidence where no other evidence

contradicting claimant disability); *Coker v. Metropolitan Life Insur. Co.*, 281 F.3d 793, 799 (8th

Cir. 2002)(cannot rely on absence of objective evidence when claimant's subjective complaints

are not contradicted or inconsistent with other record evidence);  *Sanderson v. Continental Cas.*

*Corp.*, 2005 U.S.Dist.LEXIS 20941 (D.Del. September 26, 2005)(insurer's insistence on

objective evidence in case where claimant suffered from fibromyalgia was arbitrary and

capricious as such is evidence was unavailable) citing *Brown v. Continental Cas. Co.*, 348

F.Supp.2d 358 (E.D.Pa. 2004); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir. 1997)

  Additional cases have held that where there is no requirement in policy to provide

objective proof as required by insurer that such requirement is improper.. *Burt v. Metropolitan*

*Life Insur. Co.*, 2005 U.S.Dist.LEXIS 22810 (N.D.Ga. September 16, 2005) citing *Durr v.*

*Metropolitan Life Insur. Co.*, 15 F.Supp.2d 205, 212 ("administrators and fiduciaries are

prohibited from adding a term or extra requirement into an insurance policy that is no expressly

part of it."); *Duncan v. Continental Ca*s. *Co*., Civ. No. 96-2421, 1997 WL 88374, *4 (N.D.Cal.

30

1997)(insurance company could deny claim based on lack of objective medical evidence where policy did not refer to such a requirement); *Hunt v. Metropolitan Life Insur. Co.*, 2005 U.S.App.LEXIS 21428 (8th Cir. October 4, 2005) citing *House v. The Paul Revere Life Insur. Co.*, 241 F.3d 1045, 1048 (8th Cir. 2001)(abuse of discretion to deny benefits based on absence of objective evidence where no other evidence contradicting claimant disability); *Coker v. Metropolitan Life Insur. Co.*, 281 F.3d 793, 799 (8th Cir. 2002)(cannot rely on absence of objective evidence when claimant's subjective complaints are not contradicted or inconsistent with other record evidence); *Sanderson v. Continental Cas. Corp.*, 2005 U.S.Dist.LEXIS 20941 (D.Del. September 26, 2005)(insurer's insistence on objective evidence in case where claimant suffered from fibromyalgia was arbitrary and capricious as such is evidence was unavailable) citing *Brown v. Continental Cas. Co.*, 348 F.Supp.2d 358 (E.D.Pa. 2004); *Mitchell v. Eastman Kodak Co.*, 113 F.3d 433 (3rd Cir. 1997)

        In cases where objective evidence cannot be obtained, and it would be unreasonable for an administrator to demand the impossible. *Pralutsly v. Metropolitan Life Insur. Co.*, 2006 U.S.App. LEXIS 1142, *15 (8th Cir. January 169, 2006).  For example, a verifiable condition known to cause pain is sufficient where there are no objective tests known capable of confirming the claimant's pain. *Connors v. Connecticut Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001); *Krizek v. Cigna Group Ins.*, 345 F.3d 91, 102 (2d Cir. 2003);   Followed in *Slupinski v. First Unum*, 2005 U.S.Dist.LEXIS 21601 (S.D.N.Y. September 27, 2005)

        A denial is arbitrary and capricious if it rejects a subjective claim of disability for the sole reason that it is not supported by objective evidence. *Cooke v. CNA Group Long Term Disability Insur. Plan*, 2006 U.S.Dist.LEXIS 10878, *7 (N.D.Ill. March 8, 2006)

It is error to elevate objective medical evidence to the status of an absolute prerequisite without regard to whether it was possible to provide such proof in this instance or whether its absence necessarily precludes the presence of a disabling condition. *Palmer v. University Medical Group*, 994 F.Supp. 1221, 1237 (D. Or. 1998).

Defendants' insistence on the production of "objective evidence" is only another instance of improper claims handling conduct undertaken in this case.

The Evidence Is Clear That Wright Remains Disabled.

Defendants have admitted at several points in the claim file that Wright is disabled under the plan, but seek to exclude coverage on the basis of an ambiguous 24 month restriction of payment for rheumatoid arthritis. The additional evidence submitted to the insurer which was ignored during the claim review process serves as substantial evidence of continuing disability.

Wright Has a Right to Metlife's Claims Guidelines.

The preamble to ERISA is very clear concerning the disclosure of claim guidelines, stating:

> As a concomitant to this basic disclosure, the proposal further clarified that a notice of adverse benefit determination (at both the initial level and on review) n23 must identify [*70251] specifically any internal rules, guidelines, protocols, etc. that served as a basis for the adverse benefit determination. n24 If such rules had served as a basis for the decision either at the initial level or on review, the proposal further required that a copy of the protocol be provided to the claimant upon request.

> n23 the proposal required written or electronic notice to be provided with respect to grants of benefits as well as denials. In view of the negative comments that the Department received regarding this requirement, the regulation requires written or electronic notice of benefit grants to be provided only in the case of claims involving urgent care and pre-service claims.
> n24 It is the Department's view that such internal rules, guidelines,

32

> protocols, etc. are "instruments under which the plan is established or
> operated" withing the meaning of section 104(b) of the Act and as such
> must be furnished to participants and beneficiaries upon written request.
> *See* Advisory Opinion 96-14 (July 31, 1996).

There is substantial authority which states that claimants are entitled to insurer/plan administrator claim manuals. Discovery of the claim manual was ordered in *Sterio v. Highmark Life Ins. Co.*, 2007WL 1650929 (E.D.Cal. 6/5/07) to verify if the administrator had complied with the procedural requirements of the plan. Production of the claim manual was again ordered in *Alexander v. Hartford Life and Accident Ins. Co.*, 2008 WL 906786 at *3 (N.D.Tex. 4/3/08) citing *Griffin v. Raytheon Co. Long Term Disability Plan No. 588*, 2005 WL 4891214 at *3 (N.D. Tex. 8/31/05).

Claim manuals were produced in *Ace v. Aetna Life Insur. Co.*, 139 F.3d 1241, 1245 (9th Cir. 1998) and *Paulson v. The Paul Revere Life Ins. Co.*, 323 F.Supp.2d 919, 942 (S.D.Iowa 2004); *Karamashahi v. Northeast Utilities Co.*, 41 F.Supp.2d 101 (D. Mass. 1999)(plan insurer: Liberty Mutual).

Most remarkably, Defendants fail to cite *Palmiotti v. Metropolitan Life Ins. Co.*, 2006 WL 510387 (S.D.N.Y. 3/1/06) which not only ordered production of the claim manual, but also paid an attorney fee for the time taken in litigation to acquire it. See subsequent order at *Palmiotti*, 2006 WL 1637083 (S.D.N.Y. 6/9/06).

Based on the substantial case law provided and given Defendants' unexpected recalcitrant and unsupported briefing argument, Claimant hereby requests that this court open discovery for a discovery request to be made and/or order MetLife to produce its entire claim manual and allow time for additional briefing based on the contents therein.

It should be noted that production of the claim file is not subject to a protective order as

33

set forth in *Levy v. INA Life Ins. Co. of New York*, 2006 WL 33316849 (S.D.N.Y. 11/14/06).

A plan administrator's failure to follow its own guidelines has been found to be evidence of conflict of interest. *Boyd v. Aetna Life Ins. Co.*, 2006 U.S.Dist.LEXIS 47263 C.D.Cal. June 28, 2006)(procedural irregularity when insurer failed to provide claimant with forms used to document illness); *Pulliam v. Continental Cas. Co.*, 2003 WL 1085939 (D.D.C. Jan. 24, 2003) citing *Friedrick v. Intel Corp.*, 180 F.3d 1105, 1110 (9th Cir. 1999)(finding procedural irregularities to be proof of conflict of interest); *Hensley v. Northwest Permanente Retirement Plan & Trust*, 5 Supp. 2d 887, 890 - 2 (D.Or. 1998); *See Also*, *Woodward v. Reliance Standard Life Ins. Co.*, 2003 U.S. Dist LEXIS 19206 (N.D.Fla. March 11, 2003)(citing *Cerrito v. Liberty Life Assur. of Boston*, 209 F.R.D. 663, 664 (M.D.Fla. 2002); *Caldwell v. Life Insur. Co. of N. Am.*, 165 F.R.D. 633 (D.Kan. 1996); *Blaus v. Del Monte Corp.*, 748 F.2d 148 (9th Cir. 1985).

MetLife has no excuse for its behavior in failing to produce the claim manual upon request and is subject to sanctions as further set forth below.

<u>Defendants Failed to Produce Internal Guidelines Which May Reveal Additional Misconduct.</u>

The failure to follow internal guidelines has been held as evidence of conflict of interest for which the heightened scrutiny of the plan administrator's claims denial has been applied. *Pulliam v. Continental Cas. Co.*, 2003 WL 1085939 (D.D.C. Jan. 24, 2003) citing *Friedrich v. Intel Corp.*, 181 F.3d 1105, 1110 (9th Cir. 1999); *Hensley v. Northwest Permanent Retirement Plan & Trust*, 5F.Supp.2d 887, 890 - 2 (D.Or. 1998); *See Also*, *Woodward v. Reliance Standard Life Ins. Co.*, 2003 U.S.Dist. LEXIS 19206 (N.D. Fla. March 11, 2003) citing *Cerrito v. Liberty Life Assur. of Boston*, 209 F.R.D. 663, 664 (M.D. Fla. 2002); *Caldwell v. Life Ins. Co. of Am.*, 165 F.R.D. 633 (D.Kan. 1996); *Blau v. Del Monte Corp.*, 748 F.2d 148 (9th Cir. 1985).

Given MetLife's procedural irregularities in not following its own internal guidelines, it cannot be found that the decision was a result of a deliberate principled reasoning process and is not supported substantial evidence for lack of undertaking inquiries as required by its own guidelines.

<u>Wright Is Entitled to Penalties Due to Defendants' Failure to Produce Requested Claim Documents.</u>

29 C.F.R. §2560.503-1(g)(1)(v)states:

> (A) If an internal rule, guideline, protocol, or other similar criterion was relied upon I making the adverse [benefit] determination [being communicated to the claimant, the plan's notice communicating the determination must set forth] either the specific rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule [,etc.]....will be provided free of charge to the claimant upon request. Cited in *Palmiotti v. Metropolitan Life Insur. Co.*, 2006 U.S.Dist. LEXIS 8031, *4 - 5 (S.D.N.Y. March 9, 2005)(claim manual must be produced and is not subject to protective order)

> (1) Any administrator (A) who fails to meet the requirements of paragraphs (1) or (4) of §606, §101(e)(1), or §101(f) with respect to a participant or beneficiary or (B) who fails or refuses to comply with a request for information which such administrator was required by this title to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day form the date of such failure or refusal, and the court may in its discretion or der such other relief as it deems proper.[5]

> There are additional specific documents described in the ERISA statute itself at § 104(b)(4), 29 U.S.C. § 1024(b)(4), such as the summary plan descriptions and other documents under which the plan is operated. Further, § 109(c), 29 U.S.C. § 1029(c)  provides that the Secretary of

---

[5]As required under the Debt Collection Improvement Act of 1996, the $100 limit has been increased to $110 for violations occurring after July 29, 1997. 62 Fed. Reg. 40696.

Labor may also prescribe what other documents should be furnished:

(c) Format and content of summary plan description , annual report, etc., required to be furnished to plan participants and beneficiaries. --

**The Secretary may prescribe the format and content of** the summary plan description, the summary of the annual report described in section 1024(b)(3) of this title and any other report, statements, or **documents** (other than the bargaining agreement, trust agreement, contract, or other instrument under which the plan is established or operated), **which are required to be furnished or made available to plan participants and beneficiaries** receiving benefits under the plan.(emphasis added).

The correlative reading of §109(c) and §502(c) gives the Secretary authority[6] to establish the format and content of what documents are required to be produced. Therefore, any administrator not complying with such requirements may be found liable for payment of a §502(c) penalty.

The Secretary of Labor's ERISA claim procedure regulations are set out in 29 C.F.R. § 2560.503 - 1(h)(2)(iii) set forth the documents to be provided in order to provide a full and fair review, requiring that the Plan must:

> provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits.  Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section.

The Secretary goes on to explain at Paragraph (m)(8) what documents are relevant tot he claim, and are thus required to be produced:

> (i)  A document, record, or other information shall be considered "relevant" to a claimant's claim if such document, record, or other information.
>
> (ii) **Was submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination;**

---

[6]Also, in addition to the specific authority to prescribe what documents must be provided, the Secretary also has general authority under "this subchapter" to "prescribe such regulations as he finds unnecessary or appropriate to carry out the provisions of this title."  ERISA § 505, 29 U.S.C. § 1135.

(iii) Demonstrates compliance with the administrative processes and safeguards required pursuant to paragraph (b)(5) of this section in making the benefits determination; or

(iv) In the case of a group health plan or a plan providing disability benefits; , constitutes a **statement of policy or guidance with respect to the plan concerning the denied treatment option or benefit for the claimant's diagnosis**, without regard to whether such advice or statement was relied upon in making the benefit determination. (Emphasis added)

Where the plan administrator has expressly delegated to a third party the performance of certain duties, and participants have been instructed to direct all communications to that degree, arguably the third party assumes responsibility for performing those duties and may be held liable for the failure to do so. *Palmer v. University Medical Group*, 994 F.Supp. 1221, 1241 (D. Or. 1998) citing *Rosen v. TRW, Inc.*, 979 F.2d 191, 193 - 4 (11th Cir. 1992); *Law v. Ernst & Young*, 956 F.2d 364 , 372 - 3 (1st Cir. 1992); *McKinsey v. Sentry Ins.*, 986 F.2d 401, 404 - 5 (10th Cir. 1993).

The law is clear that ERISA disclosure provisions are to be read broadly. *Bartling v. Freuhauf Corp.*, 29 F.3d 1062 (6th Cir. 1994)(holding that, because  ERISA requires a plan to maintain actuarial reports, that such documents must be provided to a participant upon request.)

Penalties have been assessed in accordance with the cited statutory authority in the following cases: *Auerbach v. Kanor-Curley Pediatric Assocs.*, 2004 WL 870702 (E.D.Pa. March, 22, 2004);  *Lowe v. McGraw-Hill*, 2004 U.S. App. LEXIS 4815 (7th Cir. March 15, 2004); *Graham v. Pactiv Corp. Benefits Committee*, 301 F. Supp.2d 483 (E.D.Va. 2004); *Kornady v. Cargill, Inc., et al.*, 2003 U.S. Dist. LEXIS 16382 (U.S.Dist.Ct. N.D.Ill. September 18, 2003); *Underwood v. Fluor Daniel Inc.*, 106 F.3d 394 (4th Cir. 1997); *Glocker v. W.R. Grace & Co.*, 19 EBC 2227, 1995 U.S.App. 28224 (4th Cir. 1995);  *Law v. Ernst & Young*, 956 F.2d

364 (1ˢᵗ Cir. 1992)(among many others).  One of the larger penalties assessed under this statutory provision occurred in *Gorini v. AMP, Inc.*, 2004 U.S.App. 7460 (3d Cir. 2004) for an award of $160,000.00 in penalties was assessed due to withholding of documents.

All the aforementioned statutory penalty cases cited state that the amount to be awarded in within the discretion of the Court. *Also See, Hennessy v. Fed. Deposit Ins. Corp.*, 58 F.3d 1995; 29 U.S.C. § 1132(c)(1)(B).  Factors considered in making such awards have included: bad faith or intentional conduct on the part of the administrator, the length of the delay, the number of requests made, the documents withheld, and the existence of any prejudice to the participant or beneficiary. *Auerbach v. Kantor-Curley Pediatric* Assocs., 2004 WL 870702 (E.D.Pa. March, 22, 2004) at *6.  In this case, the delay has been enormous and the Plaintiff has been prejudiced during the administrative appeal process by not having the claims guidelines available to provide additional insight into the insurer's review process to assist her in preparing her administrative appeal.

Penalties May Also Be Awarded Against a *De Facto* Administrator.

Under ERISA, a "plan administrator" is the "persons specifically so designated by the terms of the instrument under which the plan is operated."  29 USC § 1002(16)(A).  In this case the plan documents produced (Exhibit A) fail to name any administrator.  But, it is very evident that MetLife undertook administration of the Plan despite no express delegation of authority for this purpose.  The vague references appearing in the Plan do not constitute a clear delegation of authority as required.  *Johnson v. Unum Life Insur. Co. of Am.*, 329 F.Supp.2d 161, 170 - 1 (2004) citing *Rodriguez-Abreu v. Chase Manhattan Bank*, 986 F.2d 580, 584 (1ˢᵗ Cir. 1993); *See Also*; *DiGregorio v. PriceWaterhouseCoopers Long Term Disability Plan*, 2004 WL 1774566

(D.Mass) at *16 citing *Mario v. P&C Food Mkts., Inc.*, 313 F.3d 758, 762 (2nd Cir. 2002).  If an unauthorized party undertook review of a claim resulting in a *de novo* standard of review. *Estate of Bratton v. Nat'l. Union Fire Ins. Co. of Pittsburgh*, 215 F.3d 516 (5th 2000), *Sharkey v. Ultramar*, 70 F.3d 226 (2nd Cir. 1995),;  *Geddes v. United Staffing Alliance Employee Medical Plan*, 2005 WL 1414268 (D. Utah March 23, 2005). Where a plan provided that the benefits committee "may" delegate its authority to outside consultants or companies and actual delegation must take place results in *de novo* review. *Fitts v. Federal National Mort. Assn. and Unum Life Ins. Co. of Am.*, 236 F.3d 1, 13 (U.S. Ct. App. D.C. 2001)

   *De Facto* is defined as follows:

>    In fact, in deed, actually.  This phrase is used to characterize an officer, a government, a past action, or a state of affairs which must be accepted for all practical purposes, but is illegal or illegitimate.  Thus, an office, position, or status existing under a claim or color of right such a de facto corporation. *Black's Law Dictionary*. (5th ed. 1979)

Insurance companies often act as "plan administrators" under ERISA.  For example, by regulation, decisions and notices regarding ERISA rights are required to be sent by the plan administrator.  29 C.F.R. § 2560.503-1(f), (j).  This information is usually provided to the claimant by the insurance company when they deny a claim, which gives the appearance that the insurance company has taken on the role and attributes of a plan administrator.  This case is no exception where all ERISA mandated notices required to be sent by the plan administrator when denying a claim were sent by the insurer on all occasions when it denied the subject claim. Many courts have deemed insurers *de facto* plan administrators.  *Byrd v. Canadian Imperial Bank of Commerce*, 354 F. Supp.2d 597, 607 (D.S.C. 2005) citing *Hamilton v. Allen-Bradley Co.*, 244 F.3d 819, 824 (11th Cir. 2001).

39

§502(c)(1) penalties have been levied against *de facto* plan administrators.  The holding in *Law v. Ernst & Young*, 956 F.2d 364, 373 (1ˢᵗ Cir. 1992) states:

> If, to all appearances, Arthur Young acted as the plan administrator in respect to dissemination of information concerning plan benefits, it my properly be treated as such for purposes of the liability provided under §1132(c).  To be sure, §1002(16)(A)(I) states that the plan administrator is the party "specifically so designated" by the plan documents, and those documents named Arthur Young Retirement Committee.  But 29 USC § 1025 also confers upon plan participants and beneficiaries an absolute right to receive from the administrator information of the type sought here...

> To hold an entity not named as administrator in the plan documents may hot be held liable under § 1132(c), even though it actually controls the dissemination of plan information, would cut off the remedy Congress intended to create.

The key factor expressed in *Law* was control: both control over the plan generally; and specifically, control over dissemination of the information and documents underlying the § 502(c)(1) claim. In this matter, it is very clear that the MetLife Claims Guidelines could only be disseminated by MetLife who had control over them.  To argue that a request would need to be made to a plan administrator for production of guidelines solely held by the insurer is specious.[7]

If a company is administrating a plan , then it can be held liable for ERISA violations regardless of the provisions of the plan document.  *Rosen v. LTW, Inc.*, 979 F.2d 191, 193 - 4 (11ᵗʰ Cir. 1992), *See Also*, *Byars v. The Coca-Cola Co.*, 2004 WL 1595399 (N.D.Ga. March 18, 2004).  The fact that someone other than a statutory administrator could be held liability for penalties has "intuitive appeal."  *Fisher v. Metropolitan Life Ins. Co.*, 895 F.2d 1073 (5ᵗʰ Cir. 1990). If company personnel other than the plan administrator routinely assume responsibility

---

[7]To this end, Defendants would wish to seek cover under 29 USC § 1132(c)(1) claiming that it was a matter "reasonably beyond the control of the administrator" to produce guidelines in MetLife's possession.  Further, Defendants have sought to hinder discovery of these guidelines by filing for a protective order.

for answering requests for plan participants, the actions of those employees may be imputed to the plan administrator.  *McKinsey v. Sentry Ins.*, 986 F.2d 401, 404 (10th Cir. 1993)

A penalty may be assessed against a plan administrator even though the request for plan documents was directed to the plan administrator's counsel since there was a legal agency between the parties between the parties.  *Boone v. Leavenworth Anesthesia, Inc.*, 20 F.3d 1108, 1110 (10th Cir. 1994).  This includes a *de facto* plan administrator .  *Wilcott v. Matlack, Inc.*, 64 F.3d 1458, 1461 (10th Cir. 1995).

In Advisory Opinion 96-14A, the Department of Labor stated that:

> any document or instrument that specifies procedures, formulas, methodologies, or schedules to be applied in determining or calculating a participant's or beneficiary's benefit entitlement under an employee benefit plan would constitute an instrument under which the plan is established or operated, regardless of whether such information is continued in a document designated as the "plan document." Quoted from *Teen Help, Inc. v. Operating Engineers Health and Welfare Trust Fund*, 1999 WL 1069756 (N.D. Cal. August 24, 1999).

It was held *Carroll v. Prudential Insurance et al*, 05-1472, in the United States District Court of Maryland, Southern Division, dated 1/8/07 (Attached as Exhibit C) that the failure of Prudential, a claim administrator though not a plan administrator, to produce the summary plan documents resulted in an assessment of penalties.

The Defendants' position that they could not find any case authority concerning awarding penalties against MetLife  is rather disingenuous.  Obviously, there is ample case authority and the Defendants, again, have refused to cite to any contrary authority and feign ignorance instead. In the end, Defendants want this Court to believe a truly ridiculous argument: That somehow a claimant is required to go to a Plan Administrator to acquire documents created and held by MetLife which MetLife will refuse to produce anyway.  There is little doubt that the Defendants

are playing a very bad game at the expense of claimants which reduces their own fiduciaries ability to appeal their wrongfully denied disability claims. This conduct should punished (and seriously) by an award of substantial penalties.

**CONCLUSION:**

Defendants' positions are contradicted by the facts and law in this case. The plan does not grant discretionary authority to MetLife which requires that the *de novo* standard of review should be applied.

The claim file is replete with evidence confirming Wright's disability. The Defendants seek to use an illusory and ambiguous 24 month limitation exclusion for long term disability benefit payment for rheumatoid arthritis to justify their denial of the Wright's long term disability claim. Since serpositive results are not the required diagnostic standard, do not reveal any information about the severity of the condition, can vary from person to person as well as time to time, and are suppressed by the drugs administered to patients in order to manage their conditions and prevent increased severity, the only reason this carefully constructed exclusion has been inserted into the plan is to exclude a very large portion of the population from disability coverage. Therefore, it is very clear this limitation exclusion renders coverage illusory and should not be enforced.

The Defendants have engaged in a game of "hide the ball" in refusing to produce the claim guidelines as required under ERISA. This conduct is unseemly and is undertaken to expose corporate interests in not revealing the actual protocols utilized to assess the claims. If the claims process is made transparent, it can only make insurers and administrators look bad when the fail to live up to their own self-imposed rules. Therefore, the failure by Defendants to

produce the requested guidelines should result in an award of penalties.

The circumstances created by Defendants result in an untenable situation where Wright is placed between the proverbial "rock and hard place." To qualify for benefits, Wright would need to stop taking his health-preserving medication for months causing to him to suffer immeasurably in order to allow antibodies to develop so as achieve a positive serological test to qualify for disability benefits due to an artificial disease qualification created by the MetLife. Such a circumstance cannot be allowed to occur given the lack of any medical or legal authority to permit such a situation.

WHEREFORE, Wright respectfully requests that this court to undertake the following:

Order MetLife to produce its claim guidelines in their entirety and allow Wright to set forth additional briefing on the issues which could not be addressed in the first set of Summary Judgment pleadings;

Review the denial of benefits in this case and declare that he is entitled to all benefits under the policy including payment of all back benefits with interest;

Payment of all attorney's fees and costs associated with attempting to secure these benefits pursuant to Section 502(g)(1) of ERISA;

Assess statutory penalties payable in the amount of $110/day or other amount as to be determined by this Court pursuant to 29 C.F.R. § 2560.502 - 1(g) *et seq.* as a result of the failure of Defendants to produce the documents requested from the date of first request to the present day; and

Any such other relief the Court may deem just and proper.

Respectfully submitted,

43

_____/s/_____

Scott B. Elkind, DC BAR No.43811

Elkind & Shea

801 Roeder Rd., Ste. 550

Silver Spring, MD 20910

(301) 495-6665

Counsel for Plaintiff

REQUEST FOR ORAL ARGUMENT

      Plaintiff requests oral argument on all issues raised herein.

                        Respectfully submitted,

_____/s/_____

Scott B. Elkind, Bar 43881

Elkind & Shea

801 Roeder Rd., Ste. 550

Silver Spring, MD 20910

P: (301) 495-6665

F: (301) 565-5111

Attorney for Plaintiff

expert witness. His selective review of evidence failed to address much of the favorable evidence in the file. Then, he goes on to render a diagnosis without the benefit of any examination whatsoever. The "absence of data" led him to state that he could not conclude that there was positive or negative serological testing. This statement demonstrates that the insurer failed to send the entirety of the claim file for review in seeking a biased result by any means necessary. He concludes that the Claimant is suffering from "wrist pain of unknown etiology." This is rather amazing since there is no difference of opinion from the treating and second opinion physicians who actually examined the Claimant.

<u>The insurer ignored Claimant's receipt of other disability benefits.</u>

Claimant was approved for SSD benefits on 2/16/05 by Administrative Law Judge Mary E. Bisantz, on the basis of his rheumatoid arthritis (494 - 506).

<u>The insurer closed the claim prematurely.</u>

The Claimant wrote the insurer on several occasions to prevent his claim from being closed. His letter to "Mary" dated 12/10/04 (598 - 9) addressing an artificial deadline set by the insurer in which the Claimant was to deliver medical documents with in 10 days for review or the file would be closed. Despite the documents being faxed within this strict time limit, the claim was still closed. A similar communication was sent to Jaci Mangene on 12/13/04 (600 - 1) addressing the same grievance. The next day, the insurer agreed to allow additional time for the Claimant to produce additional documents (12/14/04 letter at 602).

<u>The insurer is guilty of sandbagging.</u>

The insurer sent out for a medical review following the appeal. This conduct has been found to be improper. An insurer cannot rely on a report obtained after the claimant's appeal is submitted without giving the claimant an opportunity to comment. *Abram v. Cargill*, 2005 U.S.App.LEXIS 1142 (8th Cir. January 24, 2005); *Harris v. Aetna Life Ins. Co.*, 2005 U.S.Dist.LEXIS 14148 (N.D.Ga. July 14, 2005).

An insurer cannot close the record to the insured but keep it open for itself. *Russo v. Hartford Life and Accid. Ins. Co.*, 2002 U.S.Dist.LEXIS 26566(S.D.Cal.) citing *Killian v. Healthsource Provident Adminstrators, Inc.*, 162 F.3d 514 (6th Cir. 1998

This doctrine extends to use of medical reviews prepared solely for the last stage of appeal to be revealed only after the final decision as was done in this case. *Abram v. Cargill*, 395 F.3d 882 (8th Cir. 2005); *Kosiba v. Merck & Co.*, 384 F.3d 58, 67 (3rd Cir. 2004)(the retention of a medical review to counter favorable evidence of claimant disability is not being a "disinterested fiduciary")

37



The insurer has issued an illusory policy.

The purpose of ERISA is to make "the private pension promise...real rather than illusory." *Kaszuk v. Bakery and Confectionary Union and Industry Int'l. Pension Fund*, 1985 WL 2183 at *5(N.D.Ill. July 15, 1985) citing H.Rep. 93-533. ERISA is to be liberally construed in favor of employer benefit fund participants. *Kross v. Western Electric Co.*, 701 F.2d 1238, 1242 (7th Cir. 1983) citing H.R.Rep. 93-533.

A claim decision may not violate the substantive or procedural requirements of ERISA. This includes attracting employees to a job with the promise of benefits which, when they are claimed, turn out to be illusory. *King v. Hartford Life and Accident Ins. Co.*, 414 F.3d 994, 1008 - 9 (8th Cir. 2005); *Bassiri v. Xerox Corp.*, 292 F. Supp.2d 1212, 1222 (C.D.Ca. 2003). ERISA purposes includes protecting "the interests of participants in employee benefit plans" and establishing standards of conduct, responsibility, and obligation for fiduciaries"of employee benefit plans. 29 USC § 1001(b)(2005); *Blessing v. J.P. Morgan Chase & Co.*, 394 F.Supp.2d 569, 584 (S.D.N.Y. 2005). An illusory promise fails to comport with this requirement.

A plan should be construed as a whole, and the specific language of each provision should be interpreted in the context of the whole. *Alexander v. Primerica Holdings, Inc.*, 967 F.2d 90, 93 (3d Cir. 1992). The provisions of an ERISA plan should be construed so as to render none nugatory and avoid illusory promises. *Crosswhite v. Reliance Standard Life Ins. Co.*, 259 F. Supp.2d 911, 917 (E.D.Mo 2003) citing *Wilson v. Prudential Ins. Co. of Am.*, 97 F.3d 1010, 1013 (8th Cir. 1996); *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98 , 103 (5th Cir. 1993)("A court should not interpret a policy to leave specific provisions without meaning or effect.") *Carr v. First Nationwide Bank*, 816 F.Supp. 1476, 1493 (N.D.Cal. 1993). Any interpretation which gives a reasonable, lawful and effective meaning to all terms is preferred to one which leaves any part unreasonable or no effect. *Kemmerer v. ICI Ams., Inc.*, 842 F.Supp. 138, 143 (E.D.Pa. 1994) citing *Musto v. Am. Gen. Corp.*, 861 F.2d 897, 906 (6th Cir. 1988) ; *Restatement (Second) of Contracts*, § 203. If an ambiguity exists, extrinsic evidence may be considered. *Howe v. Varity Corp.*, 1989 WL 98895 at *12 (S.D.Iowa July 14, 1989) citing *Anderson v. Alpha Portland Inds., Inc.*, 836 F.2d 1512, 1517 (8th Cir. 1988).

The policy terms are ambiguous at best.

As explained in the decision with local precedent applied, should the contract be deemed ambiguous in any way, the doctrine of *contra preferentum* will be applied which requires that the terms of the contract be interpreted against, the drafter. *Fitts v. Federal Nat'l. Mort. Assoc.*, 191 F.Supp.2d 67 (D.D.C. 2002) citing *Germany v. Operating Eng'rs Trust Fund*, 789 F. Supp. 1165, 1170 (D.D.C. 1992). For this reason, the phrase "when Prudential determines" does not confer discretion of the plan since it is not a "clear grant of discretion" as required under *Firestone Tire & Rubber Co. v. Bruch*, 498 U.S. 101, 115 (1989).

<u>The insurer failed to produce its guidelines as required under ERISA.</u>

The deposition transcript of Rosemary Harmon, a Metlife Case Management Specialist, taken in *Palmiotti v. Metlife*, U.S. District Court for the Southern District of New York, 04Civ.0718, sets forth many statements which reveal Metlife's claims handling practices. Ms. Harmon was trained for her position in approximately 6 weeks (P7, L25 - P8, L2) Training included materials on medical terminology, software and claims handling including a manual textbook, the Cases Management Guidlines which is now in online version which is accessed and used by all Metlife claims personnel. (P8, L20 - P9, L18) These claims materials include manuals on specific medical conditions such as multiple sclerosis (MS) (P22, L15) The guidelines set forth minimum and maximum payment periods for medical conditions. For example, the guideline for MS allows payment for a maximum of 91 days. (P39, L1 - 16) She would make the ultimate decision on whether on claim appeals. (P17, L21 - 3) She had authority to send claims for outside medical review to the four vendors used NMR, NCM, Reed, and Unival (P27, L4 - 11) Her compensation included a bonus based on company performance. (P18, L16 - P19, L20, L8) There is also a profit-sharing plan which makes contributions to her 401K retirement account based on company profits. (P21, L14 - 6)

Metlife utilized a series of claims guidelines. In the case of *Palmiotti v. Metlife*, U.S. District Court for the Southern District of New York, 04Civ.0718, The following claims review guideline documents were produced following an Order issued 3/9/05

- Claim Management Guidelines
- Claim Workflow; Chapter 15 LTD Act Criteria (Effective July 1, 2000)
- Claim Investigation Process; Chapter 2; Coverage Verification (Effective December 1, 2002)
- Claim Investigation Process; Chapter 2; Coverage Verification (Effective September 1, 2000)
- Claim Investigation Process; Chapter 9 Medical Review (Effective March 1, 2002)
- Claim Investigation Process; Chapter 9 Medical Review (Effective July 1, 2001)
- Claim Investigation Process; Chapter 10 Disability Assessment from the Occupational Standpoint (Effective July 1, 1999)
- Claim Resources; Chapter 7 Physician Consultant Program (Effective June 1, 2001)
- Claim Approval Process; Chapter 1: File Developed for Claim Approval (Effective July 1, 1999)
- Claim Denial or Termination Process; Chapter 1: Claim Denial or Termination Guidelines (Effective December 1, 2002)
- Claim Denial or Termination Process; Chapter 1: Claim Denial or Termination Guidelines (Effective July 1, 2002)
- Claim Denial or Termination Process; Chapter 1: Claim Denial or Termination Guidelines (Effective January 1, 2002)

- Claim Denial or Termination Process; Chapter 3: Applied Process (Effective March 1, 2003)
- Claim Denial or Termination Process; Chapter 3: Applied Process (Effective January 1, 2002)

Claim Management Guidelines 7. Claim Investigation Process. Chapter 9: Medical Review (Effective Date 3/1/02)[4] states that certain diagnoses or claims situations must be sent to a Nurse Reviewer that "may be difficult to quantify in terms if employee's functional abilities and limitations" and include:

- Chronic Fatigue Syndrome
- Fibromyalgia
- Soft Tissue Disorders
- Psychiatric Claims
- Self-Reported Diagnoses
- Return to work with either modified or part-time work identified, or
- Expected disability exceeds the MetLife Disability STD Normal Duration Control Guidelines

**Subjective Symptoms [5]**

Subjective symptoms describe how an individual feels (pain, tired, weak, etc.). The symptoms that the employee describes have relevance tot he diagnosis in that they should be consistent with the diagnosis provided by the attending physician.

However, subjective symptoms are not the same as a diagnosis. If the attending physician has only provided symptoms, the CS/CM should investigate further to determine the underlying diagnosis.

Symptoms may be used, however, as a source of additional validation that the stated diagnosis is accurate. If the stated diagnosis and symptoms are inconsistent, additional information should be requested from the attending physician before the CS/CM can render a disability determination.

**Objective Clinical Findings [7]**

Objective means measurable or observable. Objective clinical findings in the context of disability determination include various test results and radiological reports as well as the physician's examination findings. Along with the employee's subjective symptoms, these are the tools that the attending physician utilizes to make a diagnosis and to determine the severity of a medical condition.

There are times when the physician can make a diagnosis based upon the employee's subjective

40

complaints. However, most medical conditions do require validation through clinical examination of the employee and/or medical tests and review of their results.

The clinical findings should support the subjective complaints of the employee. If the CS/CM encounters a situation where there is a discrepancy between the subjective complaints of the employee and the clinical findings, the CS/CM should try to resolve the discrepancy by contacting the attending physician for specific information to clarify and resolve the discrepancy, or by utilizing other claim investigation resources.

**Examples:**

The following are examples of situation that would require clarification:

- The employee states that he/she cannot work because of back pain. However, x-rays and MRI testing have been within normal limits.
- The employee states that she/she cannot work because of shortness of breath. However, the pulmonary function tests are within normal limits.

**Disability Duration Guidelines** [8 - 9]

The physician's prognosis indicates that physician's best estimate (based upon medical knowledge and expertise) of the employee's anticipated recovery period. The estimation takes into consideration:

- Potential for recovery
- Underlying conditions or complications
- Employee's age
- Severity of the diagnosis

Information about the prognosis must be assessed in the context of the medical data and whether an employee performs sedentary, light, medium or heavy work.

The CS/CM should compare the physician's prognosis date for recovery to the MetLife Disability normal duration control guidelines for that specific diagnosis and work classification.

The MetLife normal duration control guidelines are estimated time-frames (measured in days for weeks) when we could anticipate an employee to have recovered from the medical condition and return to work. The MetLife Disability normal duration control guidelines take into consideration the work classification in which the employee must perform.

**Example:**

An employee is disabled with a diagnosis of Lumbago: 742.2. If the employee performs

sedentary work, the MetLife Disability Normal Duration for this particular diagnosis is 30 days. Subsequently, if the employee performs light work, the Normal Duration would be 30 days; medium work is 30 days; heavy work is 33 days; and very heavy work is 35 days.

The MetLife Disability Duration Control Guidelines are available on0line in the intillis claims system by accessing the Medical Duration Factors window.

The CS/CM should compare the physician's prognosis and return to work date against the MetLife Disability duration control guidelines. If the physician's date for recovery and return to work exceeds the normal duration for that diagnosis/procedure and work classification, the CS/CM should contact the attending physician for further information. The CS/CM should also try to determine if the employee is experiencing any complications or other factors that would prevent the employee from returning to work as we would normally expect. The CS/CM should not approve benefits beyond the normal guidelines until this issue is resolved. Documentation to support payment of benefits beyond the normal guidelines should contain this information.

**Note:** If a MetLife Disability Duration Control Guideline is not identified, the CS/CM should consult the Presley Reed Duration Guidelines or Nurse Consultant.

The Nurse Consultant (NC) referral criteria also allows for claims to be referred to the Nurse Consultant if it is anticipated that eh employee's disability period will extend beyond the normal duration guidelines.

When the CS/CM assesses a claim for prognosis and return to work, he/she should also consider the employee's ability to perform "light duty" or some type of modified or part-time work. Benefits on a particular claim may be approvable based on medical duration guidelines for a "heavy" occupation. However, the employee may be capable of performing sedentary work. Many of our STD and LTD plans have special provisions for Rehabilitation Employment.

If the physician provides an actual return to work date and the employee does not return to work until after that date, the CS/CM should only consider disability up to that date the physician released the employee to return to work. Additional information from the employee, employer and/or physician would be required to consider extending disability beyond the original release to return to work date. An employee may decide to extend his/her absence for work at the conclusion of a disability period for personal reasons (i.e., Family Medical Leave Act in regard to pregnancy claims). In this situation, the disability benefits would not be extended.

Claim Management Guidlelines 8.Claim Resources Chapter 7: Physician Consultant Program (Effective Date: 6/1/01)

**Introduction [1[**

Independent Physician Consultant (IPC) resources are independent medical practitioners

who are contracted by MetLife Disability to perform certain services.  These physicians are Board Certified in their area of expertise and many maintain an active clinical practice.  The IPC resources are available to the disability claim staff for file review and other services to support claim management.

**Goals of the Physician Consultant Program** [1]

- Expedite early communication and intervention with the employee's treating physician(s),
- Support appropriate claim management regarding recovery duration, employee return to work efforts and potential,
- Enhance risk identification and prevention; and
- Influence appropriate utilization of resources

**Contact with Employee's Attending Physician** [3]

Contact with the employee's treating provider is strongly encouraged especially if there is any difference in opinion regarding the employee's level of function and/or treatment plan.

**Physician Consultant Expectations** [9]

- Initiate contact with the employee's medical provider(s) as needed to resolve issues and/or expedite the claim management process

**Review of the Physician Consultant's Report** [12]

**Release of the IPC Report**

If the IPC report supports a claim denial or termination, it should always be sent to the employee's attending physician for review and/or comment prior to denying or terminating the claim.

Claim Management Guidelines 10.  Claim Denial or Termination Process.  Chapter 1: Claim Denial or Termination Guidelines (Effective Date 12/1/02)

**Definition of Disability** [2]

If the claim is denied because the employee does not meet the plan's definition of disability, there should be sufficient medical and vocational information in the file to support the denial of benefits.  Generally, this should include a minimum of a detailed job description for the employee as well as medical information regarding the employee's abilities and limitations.

**Use of Additional Resources as Part of the Claim Development** [6]

43

Prior to a claim denial or termination, evaluation of claim evidence may require medical and/or vocational review, if necessary, through the use of resources such as:

- Functional Capacity Evaluation (FCE)
- Transferable Skills Analysis (TSA)
- Independent Medical Evaluation (IME)
- Field Investigations including, but not limited to, Home Visits and Video Surveillance

The CS/CM should always give consideration to the referral of the additional medical and/or vocational data obtained by MetLife Disability to the employee's treating provider(s) for the purpose of obtaining further opinion and explanation, and if possible, resolution of any conflict of medical findings or opinion or other claim issues.

In the absence of clinical data indicating the presence or absence of illness or disease, such a in illnesses or conditions that are self-reported in nature, the claim investigation should focus upon and determine the impact of the employee's self-reported symptoms upon functionality. This, in turn, should be evaluated in the context of the plan wording for the definition of "total disability."

The failure to produce these guidelines will be the basis of an action for penalties should this matter proceed to litigation.

STANDARD OF REVIEW

As the policy has been administrated incorrectly the standard of review will be *de novo*. *De Novo* review is correctly assigns the task for a district court to consider the issue of whether a plan beneficiary is entitled to benefits as it had not been previously decided. In doing so, no deference afforded to an administrator's claim decision. *Neumann v. Prudential Ins. Co. of America*, 367 F. Supp.2d 969, 979 (E.D.Va. 2005) citing *Quesinberry v. Life Ins. Co.*, 987 F.2d 1017, 1025 (4th Cir. 1993).

**Please remain advised of the following:**

- **The initial request for information remains continuing in nature. All documents added to this file must be sent in a timely manner for review prior to your decision.**

- **Should you choose to have Claimant's submitted evidence reviewed by any medical and/or vocational professional, Claimant hereby reserves the right to respond to such professional's report prior to your making a final claims determination.**

44

- **The Claimant has a contractual relationship with this firm. Any and all communication concerning this matter must be directed to counsel. Further, any and all payments made in this matter are to be directed to counsel in accordance with the attached authorization.**

Respectfully,

Scott B. Elkind

cc:   Gary Carson
      Human Resources Legal Counsel
      BearingPoint International Headquarters

45

PLAINTIFF'S
EXHIBIT

TRANSMISSION VERIFICATION REPORT

```
TIME  : 10/06/2006 10:01
NAME  : ELKINDSHEA
FAX   : 3015655111
TEL   :
```

```
DATE,TIME          10/06  10:00
FAX NO./NAME       19046361929
DURATION           00:01:07
PAGE(S)            04
RESULT             OK
MODE               STANDARD
                   ECM
```

# Elkind & Shea
## The Disability Benefits Law Firm

Scott B. Elkind
(MD, DC, VA, WV)

October 6, 2006

Stephen F. Shea
(MD, DC)

Plan Administrator
BearingPoint                    By Mail and Fax (904-636-1929)
1676 International Dr.
McLean, VA 22102

Re:    Claimant: Peter Wright
       SSN: 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
       DOB: 6/24/06

Dear Plan Administrator:

Please be advised that this firm represents the above-named Claimant in connection with a long term disability insurance benefits claim. Enclosed please find an authorization for Release of Claims information executed by the Claimant.

Please provide me with the following documentation:

1.    A copy of the **entire** claims file relating or referring to the Claimant. Please note that these files include, but are not limited to all earlier claims file(s), any review of the claims file(s), and all files reflecting any continuing, ongoing or existing review of the claim. This includes all medical documentation (obtained, reviewed, prepared or otherwise considered), correspondence (paper or electronic), reviews or assessments, written notes, memoranda, forms, vendor information, job descriptions, marginalia, or any other documents involving the review of the claim;

# Elkind & Shea
## The Disability Benefits Law Firm

Scott B. Elkind
(MD, DC, VA, WV)

Stephen F. Shea
(MD, DC)

October 6, 2006

Plan Administrator
BearingPoint
1676 International Dr.
McLean, VA 22102

By Mail and Fax (904-636-1929)

Re:    Claimant: Peter Wright
       SSN: 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
       DOB: 6/24/06

Dear Plan Administrator:

Please be advised that this firm represents the above-named Claimant in connection with a long term disability insurance benefits claim. Enclosed please find an authorization for Release of Claims information executed by the Claimant.

Please provide me with the following documentation:

1.    A copy of the **entire** claims file relating or referring to the Claimant. Please note that these files include, but are not limited to all earlier claims file(s), any review of the claims file(s), and all files reflecting any continuing, ongoing or existing review of the claim. This includes all medical documentation (obtained, reviewed, prepared or otherwise considered), correspondence (paper or electronic), reviews or assessments, written notes, memoranda, forms, vendor information, job descriptions, marginalia, or any other documents involving the review of the claim;

2.    A true and correct copy of the Plan document including all amendments;

3.    A true and correct copy of the group insurance policy;

4.    A true and correct copy of all claims procedures, training instructions, protocols, or other instructional or guiding materials intended to be followed, used, or referred to during the course of the review or preparation of employees for this purpose. This includes all medical and vocational guidelines utilized as part of the review;

5.    All other writing (See: FRE Rule 1001) which you contend relates to the review

1

801 Roeder Road, Suite 550 • Silver Spring, MD 20910 • 301.495.6665 phone • 301.565.5111 fax
www.disabilitybenefitslawfirm.com • Tax ID No. 52-2232769

of the claims file;

6.   All audiotaping or videosurveillance including all raw footage which was deleted from any footage produced to you as well as all billing for such services;

7.   Copies of any records, medical or otherwise, you have obtained, prepared, reviewed, or otherwise considered in any way in connection with the claim;

8.   Any materials removed from the claims file or placed in a separate file, including medical files containing raw data or legal files with related memoranda;

9.   An explanation as to whether you contend the Plan is governed by ERISA and, if such a contention is made, a list of the names, addresses and telephone numbers of the policy/plan owners, fiduciaries, trustees and/or administrators;

10.  Any correspondence with the Plan fiduciary, its counsel, or your own counsel.

These requests are made in conformity with 29 U.S.C. §§1024, 1132(C) & 1133, as well as 29 CFR §§2560.502(c) & 2560.503-1.

This request is continuing in nature. Any subsequent information added to the claims file information must be transmitted promptly to us with adequate time to respond to all information added to the claims file.

Following receiving the claims file, counsel requests a reasonable time in order to review the file, gather necessary documentation from several sources and respond appropriately. A minimum of 60 days from receipt of the claims file is required for this undertaking.

**PLEASE BE ADVISED OF THE FOLLOWING:**

- **This a request for information and does not constitute an appeal of benefits. The appeal for benefits will be submitted within a reasonable time after we receive the requested claims documentation.**

- **Should you choose to have Claimant's submitted evidence reviewed by any medical and/or vocational professional, Claimant hereby reserves the right to respond to such professional's report prior to your making a final claims determination.**

- **The Claimant has a contractual relationship with this firm. Any and all communication concerning this matter must be directed to counsel. Further, any and all payments made in this matter are to be directed to counsel in accordance with the attached authorization.**

2

Respectfully,

Scott B. Elkind

enclosures

## NOTICE OF AUTHORIZATION, LIEN AND PAYMENT INSTRUCTIONS

**RE: Peter Wright**              **SSN: 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**

**To Any Benefit Plan Administrator, Insurance Company, And/Or Other Interested Persons:**

I have retained Scott B. Elkind, Stephen F. Shea, and Elkind & Shea, as my attorneys to represent me with regard to my claim and have obligated myself to payment of attorney fees and costs in my case. To insure that the Law Offices of Elkind & Shea are properly paid under the legal service contract, I hereby agree that the Law Offices of Elkind & Shea are granted a full lien against any entitlement I may receive or recovery made.

I give specific notice to any Administrator, Fiduciary, Insurance Company, Plan, Trust Fund, or other individual or entity responsible for payment of any benefit, settlement, and/or judgement arising from my claim from any plan, insurance, union, contract, pension or other funding source to forward any check for past due, present, or future benefits to my duly appointed attorneys: Elkind & Shea, 801 Roeder Road, Ste. 550, Silver Spring, MD 20904. This direction shall remain valid until Elkind & Shea notifies you that checks may be sent directly to me.

I also give Limited Power of Attorney to Elkind & Shea (to include Scott B. Elkind and Stephen F. Shea) to endorse any checks received with regard to any claim, judgement, payment, and/or settlement for benefits from any plan, insurance, union, contract, pension or other funding source. I understand that any checks will be deposited into a non-interest bearing trust account and held until the funds clear before my portion of the proceeds will be forwarded to me.

I further authorize that all information from my claim file in addition to Summary Plan Documents, policies of insurance, manuals and guidelines, or any other documentation employed as part of the claims review be made available to Scott B. Elkind, Stephen F. Shea, and Elkind & Shea.

_____                    12/2/05
Signature                                       Date

The above stated lien, direction to pay, and limited power of attorney are hereby accepted by Elkind & Shea.

By: _____

# Elkind & Shea
## The Disability Benefits Law Firm

Scott B. Elkind
(MD, DC, VA, WV)

November 21, 2006

Stephen F. Shea
(MD, DC)

Plan Administrator
BearingPoint
1676 International Dr.
McLean, VA 22102

By Mail and Fax (904-636-1929)

Re:    Claimant: Peter Wright
       SSN: 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
       DOB: 6/24/06

Dear Plan Administrator:

Enclosed please find the ERISA request dated 10/6/06.

You have failed to respond to this request within the mandated statutory deadline and sanctions may be requested should you fail to respond.

Respectfully,

Scott B. Elkind

enclosure

PLAINTIFF'S
EXHIBIT
C

010807opinion

1

1       UNITED STATES DISTRICT COURT
            DISTRICT OF MARYLAND
2              SOUTHERN DIVISION

3     KATHLEEN CARROLL                .

4            vs.                      .   PJM-05-1472

5     PRUDENTIAL INSURANCE            .   GREENBELT, MARYLAND
      MCARDLE PRINTING                .
6     DEFENDANTS                      .   JANUARY 8, 2007

7

8                    TRANSCRIPT OF RULING
            BEFORE THE HONORABLE PETER J. MESSITTE
9              UNITED STATES DISTRICT JUDGE

10

11    A P P E A R A N C E S:

12    FOR THE PLAINTIFF:

13    SCOTT B. ELKIND, ESQ.

14

15    FOR THE DEFENDANTS:

16    DAVID A. SELTZER, ESQ.

17

18

19

20    Court Reporter:          Sharon O'Neill, RMR
                               Official Court Reporter
21                             United States District Court
                               6500 Cherrywood Lane - RM 200
22                             Greenbelt, Maryland 20770
                               Tel. 301-344-3227
23

24

25

0                                                            2

1            The Plaintiff, Ms. Carroll, has filed a case in

2     this Court and seeks first to have the Court apply a de novo

3     standard to the decision of the Claims Administrator.  The
                            Page 1

Add. 1

4    Claims Administrtor argues that it is entitled to apply

5    either A, an abuse of discretion standard or a modified abuse

6    of discretion standard.

7        It is true that with regard to benefit plans that

8    confer discretionary authority on their administrators that

9    there is an abuse of discretion standard.  If it is, then the

10   Court to -- if discretion is applied then there is to be the

11   abuse of discretion standard.

12       There is a threshold question the Court has to

13   decide, of course, whether the plan does vest discretion in the

14   administrator or whether it's something in the plan itself.

15   The fall back is that if the plan is both funded and

16   administered by the same entity, as it is here, Prudential,

17   then a lessened standard of abuse of discretion would apply.

18   Still abuse of discretion, but according to a sliding scale.

19   This affect Ellis v. Metro Life 126 F3d 228, particularly at

20   page 233.  The Court under that standard would not disturb the

21   decision if reasonable, even if the Court might come to a

22   different conclusion.

23       The Court also said with regard to determining

24   whether there is discretion vested in the administrator, there

25   are no magic words that are required to trigger the

3

1   application.  The Court simply needs to determine whether given

2   that there is power given to the administrator to use its

3   discretion.  If there is a clear intention to do that, then in

4   fact the Court must respect it.  The clear intention concept is

5   cited in, among other cases, Feder vs Paul Revere Life

6   Insurance Company 228 F3d, 518, at 522, 23.  Fourth Circuit

7   case from 2000.

Page 2

Add. 2

010807opinion

8        As I have said, if there is no clear discretion

9     vested in the administrator, then the de novo standard applies

10    and the court reviews the case just as if it were acting on the

11    claim on a clean slate.

12        Now, the key language here in the plan is that when

13    Prudential determines that there is effectively a disability,

14    it may make decisions regarding the disability according to its

15    discretion.  The key word is "when Prudential determines", and

16    Prudential and McArdle argue that this shows clear intention to

17  · delegate final authority to Prudential to settle disputed

18    health claim questions.  And there are cases that have so

19    decided.  Judge Blake of this Court in Machovec vs. Prudential

20    Insurance Company, case number CCB 03-1920, which appears at

21    2004 U.S. District Court, held to that effect.  She really

22    applies no analysis to that finding.  She simply agrees with

23    the prior decision of the Virginia Federal Judge that says that

24    that applies.

25        A more recent, and frankly better reasoned opinion,

                                                            4

1     came from Judge Ellis of the Eastern District of Virginia, in

2     the case of Newmann vs. Prudential Insurance Company, which is

3     reported at 367 F.Supp 2d, 969, a 2005 case.  And that Judge

4     Ellis relies on a case from the Seventh Circuit by Judge Posner

5     in Herzberger vs. Standard Insurance 205 F3d 327, Seventh

6     Circuit case from 2002.  That is what Judge Ellis says in

7     analyzing the words "Prudential determines."  This is what he

8     says, at the Lexis citation at page 12: "In sum, the plain

9     meaning of the phrase Prudential determines, is that

10    Prudential, considering the evidence presented by a Plan

11    participant, must decide whether the participant is eligible

Page 3

010807opinion

12    for benefits under the terms of the Plan; it does not imply
13    discretion or warrant abuse of discretion review.  And because
14    the phrase's meaning is unambiguous, no further analysis is
15    necessary.  But even assuming the phrase is ambiguous, the same
16    result obtains because the phrase must then be construed
17    against the drafter of the Plan and in accordance with the
18    reasonable expectation of the insured that a denial of benefits
19    of the plan will be reviewed de novo in Federal Court."
20            The Court agrees with Judge Ellis that this is, the
21    meaning of "determines" is not clearly language that vests
22    discretion in the administrator, nor -- and the Court disagees
23    with defense counsel's suggestion that there is no rule of
24    contractum pro grantum (phonetic) in this case.  There is in
25    the State of Maryland a rule that in the absence of clear

5

1    language saying that the insurance contract words will not be
2    construed again the party, that the contractual language is
3    construed against the party who prepares the contract, Truck
4    Insurance Exchange vs. Marks Rentals, Inc. at 288 Maryland a
5    28, 1980 case from the Maryland Court of Appeals.
6            So there is good reason to believe that in this case
7    there is no vested discretion.  There is a side line to this
8    and that is that, and I'll come back to this momentarily, that
9    with regard to the plan summary that's presented, that was
10   presented to Ms. Carroll in this case, apparently the language
11   of ERISA that says, that supposedly accompanied the plan
12   summary when she got it, says that -- but in any event it
13   suggested in the language that said this is not part of the
14   ERISA, not part of the contract, that this is effectively
15   something that vests discretion again in the plan

Page 4

Add. 4

010807opinion

16     administrator, the plan claims administrator.

17          Ms. Carroll said she did not get that language

18   accompanying her plan description. Defense counsel is unable

19   to say whether or not she did. When we come to the issue of

20   whether documents were timely prepared, supplied, excuse me,

21   there was a letter dated February 13, 2004 in response to

22   Plaintiff's counsel's request for documents when he asked for,

23   among other things, the plan documents and was told "Please

24   refer your request for any plan information to the policy

25   holder directly," meaning McArdle. Well, what she's got is

a                                                                    6

1    something that doesn't say anything about this language of

2    ERISA vesting discretion in the claims administrator. That's a

3    side line.

4          The plain meaning of the statute, of the language of

5    the plan itself, seems to me to not vest discretion in, and any

6    ambiguity would be against Prudential and therefore the

7    appropriate standard of review would be de novo. I say that

8    because I say even parenthetically should be at most a sliding

9    adjusted abuse of discretion standard applies. I think that

10   was abused in this case, but we'll come back and first analyze

11   the de novo standard points and then from abuse of discretion

12   sliding standard basis.

13          With all the evidence that comes in here, first and

14   foremost, the Court finds it quite surprising, although not

15   absolutely required in every case, there was no independent

16   actual medical evaluation made of this plaintiff. Now,

17   certainly, there are cases where these cases can be decided

18   without any reference to medical examination. This was a case

19   where a woman had multiple surgeries, who was making extensive

Page 5

Add. 5

010807opinion

20      complaints based upon subjective pain.  At least this evidence
21      of subjective pain was reported by various physicians, and the
22      defendant really was never in a position to evaluate the
23      credibility of those claims because they never, she was never
24      simply interviewed by them, by any kind of medical personnel.
25              Beyond that, there was no medical exam at all that

0                                                                  7

1       was conducted by the defendant in this case to verify whether
2       or not there were, there was a valid claim obtained.
3               The Court finds really no full evaluation of the
4       medical regimen, excuse me, the medication regimen that the
5       defendant was on.  She is taking pain killers, obviously, and
6       there was a bit of a menu of drugs that suggested by counsel in
7       argument and the effect of taking those drugs would have to
8       control her pain was never really evaluated by the defendant.
9               One of the things that remains totally open here is
10      whether she would have been required to take more medication in
11      order to accommodate her work needs, as opposed to less if she
12      weren't working at all.  And that's really -- I don't know
13      that -- I do know that the defendant is able to say "well, if
14      you continue to take drugs up to a certain point more than you
15      might ordinarily take in order to keep working, we are entitled
16      to insist upon that."  Seems to me that without doing a careful
17      pharmaceutical analysis of the other diagnosis, that the
18      defendant is not in a position to say take the pain killers and
19      whatever you need to keep working.
20              The defendant says that the plaintiff had to come in
21      and see whether she could be accommodated by working at
22      different levels which was offered by the defendant and because
23      she did not come in to try to see whether she would could work

Page 6

Add. 6

010807opinion

24    reasonably within this so called accommodation that she somehow
25    should be faulted. Certainly her claim was that "I can't work

□                                                                                    8

1     at all," and the defendant's claim was "Yes, you can, but let's
2     see what can you do."
3             The most persuasive argument that was made by
4     plaintiff's counsel today is whether she is working 90 percent
5     of time or 80 percent of the time or 75 percent of the time,
6     the pain issues are still there. They're just not there a
7     hundred percent of the time. When she is working they are
8     there whatever percentage of the time that she's working. But,
9     again, the defendant really is not in a position to evaluate
10    the extent to which that pain is bona fide because they never
11    had her examined. And I say this now on the basis not only of
12    the de novo standard of review, but I think on the basis of
13    modified abuse of discretion standard, that somehow some kind
14    of interview should have been held, medical interview with the
15    plaintiff to determine the extent to which her complaints of
16    pain were in fact verified.
17            The Court would also agree with plaintiff's counsel
18    that there was to some extent objective verification of her
19    complaints of pain that would seem to me to take her out of any
20    possible exception of the policy that she would be relegated to
21    no particular entitlement to benefits if she was relying
22    entirely on self-reported pain. This was self-reported pain
23    that could at least to some extent be objectively verified.
24    The defendant never tried to objectively verify these things,
25    but took language at different points from reports of

□                                                                                    9

Add. 7

010807opinion

1  plaintiff's medical personnel and came to conclusions based
2  upon that.
3              The Court is satisfied, as I say again, that in
4  deciding this case de novo or deciding it on a modify abuse of
5  discretion standard that the denial of benefits in this case
6  was wrong.
7              Now, I say that and I also want to make a specific
8  statement about the failure to provide documents in this case.
9  The statute in this case, not a Code or Federal Regulation, but
10 under 29 U.S.C. section 1024 part B4, says the administrator
11 shall upon written request of any participant or beneficiary,
12 ·furnish a copy of the latest updated summary plan description
13 and the latest annual report, and in term or in part the
14 bargaining agreement, the trust agreement, contract or other --
15 -- under which the plan is established or operated.  The
16 administrator may make a reasonable charge to cover the cost of
17 furnishing such copies.
18             Now, this is a statute, not a reg, and this is a case
19 where when the request was made pursuant to a letter from
20 counsel for plaintiff the response was not in compliance with
21 the statute.  Mr. Elkind, tell me again where your letter
22 appears.
23             MR. ELKIND:  Yes.  One moment, Your Honor.  The
24 letter appears at Prudential 273, dated January 30, 2004.
25             THE COURT:  The letter was sent on January 30, 2004

0                                                        10

1  to Melanie Covington (phonetic) at Prudential's office in
2  Philadelphia.  Please provide me with the follows documents,
3  copy of the entire claims file and relating or referring to the

Page 8

Add. 8

010807opinion

4    claim, number one.  Number two, true and correct copy of the

5    plan document.  Number three, a true and correct copy of the --

6    Number four, a true and correct copy of all SPD issued by the

7    plan since 1999.  A true and correct copy of all claims

8    proceedings intended to be filed, used or referred to during

9    the course of the review.  Six, all other writings which you

10    contend relate to the review.

11          Now, the response that was given was by letter dated

12    February 11, February 13, 2004 and it says "We are in

13    receipt -- this is from May I. Gellagel (phonetic) and she is

14    writing from Philadelphia to Mr. Elkind -- "We are in receipt

15    of your request for documentation regarding Kathleen Carroll

16    and her authorization to release medical documentation to you

17    office.  Enclosed is a complete copy of all the documents

18    contained in Ms. Carroll's file and used in the determination

19    on her claim."

20          Now, skipping to the next paragraph, "Your letter

21    also requests plan documents.  G 75534 was issued to McArdle

22    Printing Company, Inc.  Please refer your request for any plan

23    informatoin to the policy holder directly."  That's directly in

24    violation of the statute.

25          The administrator in this case was Prudential.  They

0                                                         11

1    were required to provide the plan requested, particularly where

2    here there appears to be a discrepancy between the plan that

3    they are now relying on in terms of establishing the

4    appropriate standard of review and the plan that was in fact

5    distributed to her by her employer.  Well, that issue still

6    remains open.  But there is no basis to say, as Ms. Gelagel

7    said in her letter of February 13, 2004, talk to your plan

Page 9

Add. 9

010807opinion

8    administrator.  An insured under the plan is not required to
9    chase around for plan documents.

10          This is a fiduciary duty Prudential has.  They're to
11   have those documents in hand.  They are to supply them when
12   requested.  They may charge appropriately, but they may not say
13   talk to somebody else.  And clearly in that view, in my view a
14   violation of the statute which does result in an appropriate
15   assessment.

16          I'm going to order $1,500 to the plaintiff on that
17   part of the claim alone for the failure, only as to the plan
18   documents.  I'm not finding that the failure to provide the
19   claims manual was a failure under the statute, because I think
20   it's doubtful whether or not the plaintiff was entitled to the
21   claims manual.  But there is no question that explicitly under
22   the statute that she was entitled to, among other things, the
23   plan itself, the updated plan itself, to say the least.  Annual
24   report, I don't know that that would be the covered, trust
25   agreement, the underlying contract itself.

                                                          12

1           And Prudential needs to take that to heart because if
2    they don't do this in the future they stand to be sanctioned
3    yet again.

4           We are at a point, in my view, where the Court will
5    deny the defendant's motion for summary judgment\cross motion
6.   for summary judgment.  Will grant the plaintiff's motion for
7    summary judgment.

8           I do not know whether there is a specific dollar
9    amount that needs to be considered at this point or whether it
10   would suffice to say that the motion is granted.  I don't know
11   if you have done a calculation, have you, Mr. Elkind what

Page 10

Add. 10

010807opinion

12  ·· amount would be due under the plan.

13           MR. ELKIND:  I would have to discuss that with

14     defense counsel.  We'll work it out.

15           THE COURT:  Well, it's not only amounts, amounts past

16     due with related interest.  We didn't address specifically the

17     issue of long term disability.  That wasn't really much argued,

18     although it does say, to go back to that for a moment, any

19     gainful employment related to the initial work.  I don't know.

20     Maybe you want to say something about this before I go any

21     further.  My inclination is to say that the same factual base

22     that results in the finding that she was ununable to work doing

23     the kinds of thing the she was doing would suffice to establish

24     that she was unable to persue any gainful employment that would

25     compensate her at the rate of 60 percent of her prior earnings,

0                                                               13

1      but we didn't really argue that very much.

2           Do you want to say anything about that, just take a

3      hiatus for a moment, Mr. Elkind.

4           MR. ELKIND:  Your Honor, what I think -- well, is

5      typically done in this case, and I think maybe the parties

6      contemplated here without discussing it, was in view of a

7      finding such as Your Honor is making, benefits would be paid

8      for Ms. Carroll from the day she went out of employment to

9      current.  She would be put what is called back in plan and

10     there would now be a new assessment as to what her current

11     condition is evaluated.

12           THE COURT:  I don't need to make that assessment

13     then.

14           MR. ELKIND:  Your Honor, are you just finding her

15     disabled and that's what would happen by course.

Page 11

Add. 11

010807opinion

16          THE COURT:  Disabled.  Will that close the case

17    without a number or do we do that?

18          MR. ELKIND:  We have to come back -- I have done this

19    before, Your Honor.  We come back to you with an agreed upon

20    number within 30 days and we just have the Court issue an

21    order.  If there is any other problem, we couldn't come to a

22    number, then we are to instruct the Court and we have a

23    hearing.

24          THE COURT:  All right.  Let me leave it this way

25    then, I will not enter an order today.  I'll leave it to

                                                              14

1     counsel to submit an order based on the agreement.  The order

2     should read that the defendant's cross motion to plaintiff's

3     motion for summary judgment is granted.  The defendant's

4     motion, cross motion for summary judgment is denied.  The

5     plaintiff is declare disabled under the contract and that

6     appropriate benefits shall be payable in the amount of

7     whatever, and that if there is to be a further assessment on

8     the issue of eligibility for gainful employment, that that will

9     also take place, and you want to see if you can agree on

10    attorney's fees at the same time?

11          MR. ELKIND:  Yes, Your Honor.

12          THE COURT:  If there is an agreement on attorneys

13    fees and costs, the Court will award attorney's fees in the

14    amount of blank dollars, so on and so forth.  If you can't,

15    then you can let me know.

16          MR. ELKIND:  Your Honor, one more thing to assist us.

17    The judgment rate of interest would be the Maryland state

18    judgment rate?

19          THE COURT:  Is it six percent.

Page 12

Add. 12

010807opinion

20        MR. ELKIND:  It's 10 percent.

21        THE COURT:  I haven't looked at it.  I understand

22    there is a federal rate of interest.  There is a federal rate

23    of interest, is there not?

24        MR. ELKIND:  I never heard of one, Your Honor.

25        THE COURT:  You better look at that.  In the absence

0                                                               15

1    of an applicable federal rate of interest, the Maryland rate of

2    interest would apply.

3        MR. SELTZER:  May I be heard on one point, Your

4    Honor, only with respect to the penalty issue.

5        THE COURT:  What issue?

6        MR. SELTZER:  With respect to the penalty issue with

7    regards to the production of documents.  To the extent that

8    Your Honor is not issuing an opinion yet, or an order yet,

9    perhaps it's necessarily held in abeyance, but to the extent

10    that I would just like to confirm from my client to the extent

11    that your record that we referred to thus far isn't complete

12    and while the response Your Honor put into the record does

13    indeed exist, there was again a subsequent request from

14    plaintiff's counsel and I frankly don't know how that was

15    addressed.

16        If I could, you know, if there was some evidence that

17    the documents were indeed produced or tendered, perhaps could

18    that issue be held in abeyance pending further --

19        THE COURT:  Well, for present purposes the problem I

20    had is it says "Go talk to somebody else."  You can't do that

21    under the statute.  Under the statute are you required when

22    asked, and you have 30 days to do it, by the way, under the

23    statute.  I think that's right.  You read 30 days, didn't you?

Page 13

Add. 13

24    You're reading it under the reg.

25         MR. SELTZER:  Right.

16

1         THE COURT:  I don't have the reg in front of me.  The

2    statute doesn't put it, place a time.  You say up to a hundred

3    dollars a day.  I haven't assessed you a hundred dollars a day.

4    I just put $1,500.

5         MR. SELTZER:  I respect that Your Honor.

6         THE COURT:  Which I thought was appropriate, which

7    would make a point to your client that you can't say go to

8    someone else to get the plan documents.  You're a fiduciary.

9    You've got to provide them pursuant to the reg within 30 days

10    or be liable for up to a hundred dollars a day at the Court's

11    discretion.  The number I picked just because obviously a long

12    period of time went by and they didn't have them.  Whether they

13    eventually gave it or not really would not resolve the concern

14    that I have, which is that it wasn't done within 30 days,

15    unless you can show it was.

16         MR. SELTZER:  That's my point.  I don't know that I

17    can or not, Your Honor, but to the extent that, again, I wasn't

18    aware of that until we began argument today.  I would just like

19    some opportunity to question that one way or another.  It may

20    be that, indeed, it wasn't and your penalty stands and that's

21    the end of that.

22         THE COURT:  Well, to the extent that my penalty

23    stands, put it in the order.

24         MR. SELTZER:  Yes, sir.

25         THE COURT:  The Court will assess that amount and the

17

Add. 14

010807opinion

1    penalty will apply.  And it can be limited to the plan document

2    itself.  Nothing is more important than that.

3           MR. SELTZER:  Very well.

4           THE COURT:  That really is the guts of the case.

5    Whether there are other documents that were or were not

6    supplied, I'm certainly not prepared to say they were entitled

7    to your claims manuals or your training manuals.  That's asking

8    for perhaps too much, but not the plan.  The plan is the main

9    event so you are supposed to get that out in 30 days.

10          All right.  You work out your order.  Get it to me

11   within, get it to me within 30 days.  See what you can work out

12   on your numbers.  All right.  Thank you.

13          MR. ELKIND:  Thank you, Your Honor.

14          MR. SELTZER:  Thank you, Your Honor.

15

16                  COURT REPORTER'S CERTIFICATE

17          I hereby certify that the aforegoing transcript was

18   prepared to the best of my ability due to a total failure of

19   the audio system in courtroom 4C during this hearing.

20

21                          Sharon O'Neill

22

23

24

25

                          Page 15

                    ┌─────────────┐
                    │  Add. 15    │
                    └─────────────┘