## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
                                                    )
PETER WRIGHT,                                        )
                                                    )
              Plaintiff,                             )
                                                    )
       v.                                            )
                                                    )        Civil Action No. 07-1808 (RBW)
METROPOLITAN LIFE INSURANCE                          )
COMPANY, d/b/a METLIFE DISABILITY,                   )
and BEARINGPOINT, INC. LONG TERM                     )
DISABILITY PLAN,                                     )
                                                    )
              Defendants.                            )
———————————————————————)

## MEMORANDUM OPINION

The plaintiff, Peter Wright, brings this action under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1132(a)(1)(B), (a)(3) (2006),

against defendants Metropolitan Life Insurance Company, doing business as MetLife

Disability ("MetLife"), and BearingPoint Inc. ("BearingPoint") Long Term Disability

Plan ("Plan"),[1] alleging that the defendants violated the ERISA by breaching the fiduciary

duty they owed him under § 1132(a)(3) and wrongfully denying him benefit coverage

under § 1132(a)(1)(B) when they terminated his long-term disability benefits following

his receipt of those benefits for approximately thirty months.  See generally Complaint

("Compl.").  The plaintiff also alleges that MetLife did not properly provide to him upon

his request documents relevant to his ERISA claim, which he contends is a violation of

---

[1]        KPMG Consulting, Inc. was the predecessor company of BearingPoint, and where the
administrative record refers to KPMG Consulting, Inc., the Court will instead refer to it as
"BearingPoint" for the sake of simplicity.  See Compl. ¶ 6; Defendants' Statement of Undisputed
Material Facts and Memorandum of Points and Authorities in Support of Their Motion for
Summary Judgment at 2 n.1.

29 C.F.R. § 2560.502-1(g) (2008).[2]  Compl. ¶ 24.  In response, the defendants maintain

that they acted in accordance with the express terms of the Plan when they made the

decision to terminate the plaintiff's benefits after his receipt of over twenty-four months

of benefits, and that defendant MetLife provided the plaintiff all documents he was

entitled to receive under the ERISA.  See Defendants' Joint Answer ("Answer") at 4-7.

Currently before the Court are the parties' cross-motions for summary judgment.

Defendants' Motion for Summary Judgment ("Defs.' Mot."); Plaintiff's Cross Motion for

Summary Judgment ("Pl.'s Mot.").[3]  Upon consideration of the parties' written

submissions and the administrative record in this case, and for the reasons set forth

below, the Court must grant summary judgment to the defendants.

---

[2]       In his complaint the plaintiff identifies "29 C.F.R. § 2560.502 - 1(g) et. seq." as his legal
authority for the assessment of penalties against MetLife based on its alleged failure to respond to
his documents request, Compl. ¶¶ 24, 28.  Because that provision does not exist, the Court will
assume the plaintiff is invoking 29 U.S.C. § 1132(c)(1) and 29 C.F.R. §§ 2560.503-1(g),
2575.502c-1, which seemingly relate to the document request allegation.

[3]       The Court also considered the following papers filed in connection with the parties'
cross-motions: Defendants' Statement of Undisputed Material Facts and Memorandum of Points
and Authorities in Support of Their Motion for Summary Judgment ("Defs.' Mem."); a
Memorandum of Points and Authorities in Support of Plaintiff's Cross Motion for Summary
Judgment ("Pl.'s Mem.") (the plaintiff's memorandum in support of his motion for summary
judgment also opposes the defendants' motion for summary judgment); Defendants' Opposition to
Plaintiff's Cross Motion for Summary Judgment and Reply on Defendant's Motion for Summary
Judgment ("Defs.' Opp'n & Reply"); and a Memorandum of Points and Authorities in Support of
Plaintiff's Reply to Defendant's [sic] Reply to Plaintiff's Cross Motion for Summary Judgment
("Pl.'s Reply") (despite the title of this document, which suggests it is a sur-reply, it serves as the
plaintiff's reply to the defendants' opposition to his motion for summary judgment).

## I. BACKGROUND

**A.     The Terms of the Plan**

At all times relevant to this litigation, BearingPoint sponsored an insurance package for its employees as a benefit of their employment[4] – the defendant Plan – the only component of the package pertinent to this action being the provision for long-term disability coverage.  Compl. ¶ 7; Answer ¶ 7. See generally Defs.' Mem. at 17, Ex. A at ML00069 (Your [BearingPoint] Employee Benefit Plan . . . [,] Long Term Disability Benefits ("Long-Term Disability Benefits Plan")).  The Plan provides that BearingPoint, as the employer, is the Plan administrator.  Defs.' Mem. at 17, Ex. A at ML00099 (Long-Term Disability Benefits Plan).  The Plan also provides that MetLife serves a dual role, both as the insurer of the policy and as the processor of claims for benefits under the policy.  Id. at ML00099-100.  Specifically, the Plan details a process by which a participant seeking long-term disability benefits must submit evidence of a qualified disability to MetLife in order to establish entitlement to monthly benefits.  Id. at ML00079-80, ML00099-100.

---

[4]          Employer-sponsored benefit plans covered by the ERISA include

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions).

29 U.S.C. § 1002(1) (2006).

Under the Plan, monthly long-term disability benefits were only awardable if a

participant had a qualifying disability, which requires that the participant be

> [1.] unable to perform the material and substantial duties of
> [a participant's] Own Occupation, [be] under the regular
> care of a Doctor and [be unable to] work[] at any job for
> wage or profit, unless in an approved Rehabilitation
> Program; [and]

> 2.  after the first 36 month period, [the participant is]
> unable to perform any job for which [the participant is]
> qualified or for which [the participant] may become
> reasonably qualified taking into account [the participant's]
> training, education or experience[.]

Id. at ML00081.  The Plan states that monthly benefits can be terminated for various

reasons, including "the end of the period specified in the Limitation for Disabilities Due

to Particular Conditions," id. at ML00080, and it expressly includes a twenty-four month

limitation period for the receipt of benefits for certain disabilities, with exceptions.

Regarding the plaintiff's challenge to the termination of his benefits, the only relevant

provision of the Plan states that the receipt of benefits arising from a

"[n]euromusculoskeletal and soft tissue disorder including, but not limited to, any disease

or disorder of the spine or extremities and their surrounding soft tissue[,] including

sprains and strains of joints and adjacent muscles, [are limited to twenty-four months]

unless the Disability has objective evidence of . . . seropositive arthritis."  Id. at

ML00088.  Rheumatoid arthritis is an example of a neuromusculoskeletal and soft tissue

disorder, which can be classified as either seronegative or seropositive.[5]  Defs.' Mem. at

---

[5]      For the first time in his reply brief, the plaintiff expresses doubt as to whether the Plan's
classification of rheumatoid arthritis as a neuromusculoskeletal and soft tissue is sound.  Pl.'s
Reply at 9 ["[The Plan] describe[s] [rheumatoid arthritis] as a 'neuromusculoskeltal and soft tissue
disorder.' The most cursory review of the medical literature fails to reveal a single time that
rheumatoid arthritis is described as such. . . .  Defendants have not contested that this is the proper
(continued . . .)

6; Pl.'s Mem. at 12.  Therefore, under the provisions of the Plan applicable to this case, a

person with rheumatoid arthritis can receive coverage for only twenty-four months for

claims arising from a neuromusculoskeletal and soft tissue disorder, unless the participant

can prove that the condition is seropositive, which is an exception to the coverage

limitation.  Defs.' Mem., Ex. A at ML00087-88 (Long-Term Disability Benefits Plan).

The Plan defines "Seropositive Arthritis" as "[a]n inflammatory disease of the joints

supported by clinical findings of arthritis plus positive serological tests for connective

tissue disease."  Id. at ML00088.

   With respect to MetLife's dual role under the Plan as both the insurer and claims

processor processor, id. at ML00099-100, the Plan delegates this authority to MetLife in

two separate provisions, id. at ML00071, ML00101.  The first provision, titled

"Certificate of Insurance," states: "MetLife in its discretion has authority to interpret the

terms, conditions, and provisions of the entire contract.  This includes the Group Policy,

Certificate and any Amendments."  Id. at ML00071.  The second provision, contained

within a subsection under the heading "Claims Information," states:

---

diagnostic standard for rheumatoid arthritis.").  Courts "highly disfavor[] parties creating new
arguments at the reply stage that were not fully briefed during the litigation."  Pub. Citizen Health
Research Group v. Nat'l Insts. of Health, 209 F. Supp. 2d 37, 43 (D.D.C. 2002) (citations
omitted).  In any event, even if the Court were to entertain this untimely and cursory argument,
the plaintiff's own proffered medical test for rheumatoid arthritis does not suggest that the Plan's
classification of rheumatoid arthritis as a neuromusculoskeltal and soft tissue disorder was
improper.  The plaintiff asserts that rheumatoid arthritis is evidenced by the presence of factors
such as joint stiffness, swelling of the tissue, and "[s]ubcutaneous nodules over bone
prominences, extensor surfaces or in juxtaarticular regions" (effectively meaning small, irregular
masses occurring under the skin, among other places, over prominent bones and near joints, see
Stedman's Medical Dictionary 151, 634, 1221-22, 1456, 1715 (27th ed. 2000).  Pl.'s Reply at 9.
These factors seem easily subsumed within a classification of disorders relating to the soft tissue
surrounding nerves, muscles, or bones.

**Discretionary Authority of Plan Administrator and Other Plan Fiduciaries**

In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

Id. at ML00100-01.

**B.     The Plaintiff's Disability**

The plaintiff, an employee of BearingPoint, is a participant in the Plan.  Compl. ¶ 6; Answer ¶ 6; Defs.' Mem. at 2.  Early in 2002, he was diagnosed with rheumatoid arthritis and was approved for long-term disability benefits on or about August 23, 2002. Compl. ¶¶ 11, 13; Answer ¶¶ 11, 13; see also Defs.' Mem., Ex. A at ML02871-72 (June 24, 2002 Letter from Chris Drzata to Peter Wright).  Due to the plaintiff's condition, he was (and is likely still) unable to maintain a work schedule equivalent to the schedule he maintained prior to his diagnosis.  Pl.'s Mem. at 4.  His physicians determined that sometimes the plaintiff could not operate a computer due to his inability to use his hands, id., needed arm guards, suffered from "stiffness of [his] hips and feet," had been prescribed multiple medications, and "ha[d] limitations with all functional upper extremity activities including perineal care, dressing, combing hair, washing axilla, working, eating with utensils, among others," id. at 5.  However, during his treatment, the plaintiff's doctors confirmed that he had the seronegative form of rheumatoid arthritis, not the seropositive form of the disease.  Defs.' Mem., Ex. A at ML00545 (Dec. 30, 2004

Letter from Claudia J. Svara, M.D., to Whom It May Concern); ML00546-47 (Dec. 20, 2004 Letter from Rex McCallum, M.D., to Sirs); ML00551 (Dec. 7, 2004 Letter from A. Silvia Ross, M.D., to Sirs).

Twenty-seven months after the plaintiff's receipt of long-term benefits, MetLife sent him a letter to the plaintiff requesting additional medical information demonstrating that he was entitled to continued long-term benefits; in other words, that his condition met one of the exceptions to the twenty-four month limitation coverage period.  Defs.' Mem., Ex. A at ML00112-13 (Nov. 24, 2004 Letter from Jaci Mangene to Peter Wright). Specifically, MetLife sought "additional medical information . . . . in regard to [the plaintiff's] current rheumatoid factor" and indicated that because his condition fell within the "[n]euromusculoskeletal and soft tissue disorder" provision of the Plan, he would have to provide "objective evidence" that his condition met one of the exceptions to the coverage limitation – in this case the only applicable exception being that his condition was diagnosed as "seropositive arthritis" – or his benefits would be terminated.  Id. at ML00012.

MetLife prematurely "denied" and "closed" the plaintiff's claim for continued long-term disability benefits based on its mistaken belief that the plaintiff had not submitted the additional medical documentation requested by MetLife's deadline of December 8, 2004.  See id. at ML00110-11 (Dec. 8, 2004 Letter from Jaci L. Mangene to Peter Wright); ML02566-67 (Dec. 20, 2004 Letter from Jaci L. Mangene to Peter Wright).  However, when MetLife discovered that the plaintiff had, in fact, submitted information about his medical condition by the designated deadline, see id. at ML02582-89 (Dec. 8, 2004 Memorandum from Peter Wright to MetLife Insurance); ML02610

(Dec. 8, 2004 Memorandum from Peter Wright to EJ); ML02619-26 (Dec. 8, 2004

Memorandum from Peter Wright to EJ (Team Lead)); ML02592-93 (Dec. 10, 2004

Memorandum from Peter Wright to Mary); ML02590-91 (Dec. 13, 2004 Memorandum

from Peter Wright to Jaci Mangene); ML02540-50 (Dec. 30, 2004 Letter from Justin C.

Frankel to Jaci L. Mangene), it reversed its decision closing the plaintiff's claim and

proceeded to determine his eligibility, id. at ML02573 (Dec. 13, 2004 Letter from Jaci L.

Mangene to Peter Wright) (informing the plaintiff that MetLife had received his medical

information submissions and would review his claim); see also id. at ML00109 (Dec. 16,

2004 Letter from Jaci L. Mangene to Peter Wright) (informing the plaintiff that MetLife

desired "[s]erological test results for connective tissue disease as of initial diagnosing of

rheumatoid arthritis" for it to further consider his claim); ML02566-67 (Dec. 20, 2004

Letter from Jaci L. Mangene to Peter Wright) (informing the plaintiff that MetLife would

be "continuing [the plaintiff's] monthly benefit until a determination is made" on his

claim for long-term benefits).  Ultimately, MetLife determined that the plaintiff was not

entitled to receive further long-term benefits due to his condition not being classifiable

under one of the exceptions to the coverage limitation, and terminated his benefits as of

January 10, 2005.  Id. at ML02498-500 (Jan. 19, 2005 Letter from Jaci L. Mangene to

Peter Wright).

       Prior to MetLife's denial of his claim, the plaintiff, who had in the interim

acquired the services of an attorney, requested several documents from MetLife related to

his claim.  Id. at ML00568 (Dec. 21, 2004 Letter from Justin C. Frankel to Jaci L.

Mangene).  In response to the request, MetLife provided a copy of the Plan to the

plaintiff.[6]  Defs.' Mem., Ex. A at ML00556 (Dec. 28, 2004 Letter from Jaci L. Mangene

to Justin C. Frankel).  However, not satisfied with MetLife's document production, the

plaintiff submitted subsequent document requests to MetLife, seeking, for example, its

"claim handling practices, policies and procedures," its "agreements with third parties

performing any outside reviews," any "service agreements" between BearingPoint and

Metlife, all e-mails and related information in MetLife's computer system or in hard copy

form pertaining to the plaintiff's claim, and all surveillance materials compiled by

MetLife.  Id. at ML00821-23 (Mar. 14, 2005 Letter from Justin C. Frankel to Jaci L.

Mangene); ML00815-19 (Jan. 21, 2005 Letter from Justin C. Frankel to Jaci L.

Mangene).  MetLife responded with the production of additional documentation,

including the plaintiff's updated claim file and "all medical documentation and

correspondence on file" related to the plaintiff's claim, id. at ML02496 (Feb. 11, 2005

Letter from Jaci L. Mangene to Justin C. Frankel); ML02484 (Mar. 10, 2005 Letter from

Jaci L. Mangene to Justin C. Frankel); ML00825 (Mar. 28, 2005 Letter from Jaci L.

Mangene to Justin C. Frankel).  Ultimately, however, MetLife told the plaintiff that it had

provided all the information relevant to his claim under its ERISA-imposed obligations,

id. at ML00860-61 (Sept. 12, 2005 Letter from Jaci L. Mangene to Justin C. Frankel).

On May 26, 2005, the plaintiff appealed MetLife's denial of his benefits to the

company's Appeals Unit.  Id. at ML02310-39 (May 26, 2005 Letter from Justin C.

Frankel to Appeals Unit, MetLife Disability).  After an independent claim review was

---

[6]        Prior to his representation by legal counsel, the plaintiff requested a copy of the Plan from
BearingPoint and stated that he anticipated that BearingPoint would provide it to him.  Defs.'
Mem., Ex. A at ML02581 (Dec. 14, 2004 Memorandum from Peter Wright to Jaci Mangene).
However, there is no indication in the record whether the plaintiff ever received the document
from BearingPoint.

conducted, MetLife affirmed its denial of the plaintiff's claim for the receipt of continued
long-term benefits.  Id. at ML00826 (June 2, 2005 Letter from Appeal Unit,
MetDisability to Justin Frankel); ML00827-29 (June 23, 2005 Letter from Lisa
Touloumjian to Justin Frankel).

 The plaintiff, through his attorneys, thereafter sought additional documentation
from MetLife concerning his claim, id. at ML00847-51 (July 19, 2005 Letter from Justin
C. Frankel to Lisa Touloumjian); ML00858-59 (Sept. 14, 2005 Letter from Justin C.
Frankel to Jaci L. Mangene); ML00864-66 (Oct. 6, 2006 Letter from Scott B. Elkind to
Lisa Touloumjian); ML02261 (Oct. 24, 2006 Letter from Scott B. Elkind to Leah
McCarthy); ML02252 (Nov. 3, 2006 Letter from Scott B. Elkind to Leah McCarthy),[7]
resulting in MetLife's production of some additional documentation, while generally
maintaining that it had satisfied its obligations under the ERISA and advising the plaintiff
that he would need to make a request to BearingPoint for any specific Plan-related
documents, id. at ML00860-61 (Sept. 12, 2005 Letter from Jaci L. Mangene to Justin C.
Frankel); ML02262 (Oct. 19, 2006 Letter from Leah McCarthy to Scott Elkind);
ML02254 (Oct. 27, 2006 Letter from Leah McCarthy to Scott Elkind); ML02175 (Dec.
15, 2006 Letter from Leah McCarthy to Scott B. Elkind).

 On February 5, 2007, having acquired a different counsel midway through his
appeal, the plaintiff again appealed MetLife's decision to deny him long-term benefits

---

[7] Through unrelenting requests, the plaintiff's attorney continued to seek information that
the administrative record reflects had, at least in part, already been provided to the plaintiff by
MetLife, requests which ultimately took on a snide, impetuous, and unprofessional tone.  See
ML02252 (Nov. 3, 2006 Letter from Scott B. Elkind to Leah McCarthy) ("I must ask the
following: Do you really want me to believe that your company that issued the policy under
which you have administered the above-referenced claim cannot provide a copy of the policy
although it is clearly a pertinent document required to be produced under ERISA?  YOU MUST
BE JOKING.")

beyond the twenty-four month period.  Id. at ML02215-50 (Feb. 5, 2007 Letter from

Scott B. Elkind to Leah McCarthy); ML02212; (April 6, 2007 Letter from Scott B.

Elkind to Leah McCarthy); ML02214 (Feb. 15, 2007 Letter from Leah McCarthy to Scott

B. Elkind).  By a letter dated May 11, 2007, MetLife responded that although the plaintiff

"had previously exhausted his administrative remedies," MetLife, as a "claim fiduciary,"

had conducted an additional "courtesy" review of the plaintiff's claim.  Id. at ML00188-

93 (May 11, 2007 Letter from Leah McCarthy to Scott Elkind); see also Defs.' Mem. at

11.  Specifically, MetLife stated that it "examined the entire claim file, including any

additional material and information provided with [the plaintiff's attorney's latest] request

for review," which included hundreds of pages concerning rheumatoid arthritis in its

seropositive and seronegative permutations, and affirmed its previous denial of the

plaintiff's claim based upon its finding that the plaintiff had not demonstrated that his

condition met the exception to the Plan's twenty-four-month coverage limitation period.

Defs.' Mem., Ex. A at ML00188-93 (May 11, 2007 Letter from Leah McCarthy to Scott

Elkind); see id. at ML001028-2034.  As to the plaintiff's allegations that MetLife had

unlawfully withheld documents he was entitled to receive, MetLife retorted that it had

produced all relevant documents that it was obligated to produce under the ERISA.  Id. at

ML00192-93 (May 11, 2007 Letter from Leah McCarthy to Scott Elkind).  MetLife

further rejoined that it was "not required to provide any internal guidelines in connection

with [the plaintiff's] claim" because its "internal guidelines are not plan specific," and

MetLife did not rely upon any such documents in making its determination on the

plaintiff's claim.  Id.

Having thoroughly exhausted his administrative remedies, the plaintiff brought this action seeking judicial review of MetLife's termination of his long-term benefits, arguing that the defendants violated their fiduciary duty to him under § 1123(a)(3) of the ERISA, as well as wrongfully denying him benefits under § 1123(a)(1)(B). Compl. ¶¶ 4, 22-23. The plaintiff also maintains that MetLife's failure to provide him with a copy of their internal "claims manual provisions or handling instructions under which [his] claim was reviewed" violates 29 C.F.R. §§ 2560.503-1(g), 2575.502c-1. Id. ¶ 24. The plaintiff seeks a declaration of his rights on these two challenges, reinstatement of his long-term disability benefits, "payment of all back benefits due and owing plus interest," "clarif[ication] [of] all rights to future benefits under the plan," statutory penalties, and all of his attorney's fees and costs. Id. ¶¶ 4, 26-29. It is the defendants' position that they acted in accordance with the Plan and the ERISA in rendering the decision to terminate the plaintiff's long-term disability benefits after the required twenty-four months coverage period had elapsed, and that the plaintiff was provided with all the documentation he was entitled to receive from defendant MetLife. See Answer at 4-7. Based on the administrative record currently before the Court, Defs.' Mem., Ex. A; see also id. at Ex. B (Declaration of Margaret Calderon Regarding the Administrative Record), both parties seek summary judgment.

## II.  STANDARD OF REVIEW

### A.      Summary Judgment

To grant a motion for summary judgment under Rule 56(c), this Court must find that "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Under Rule 56(c), if a party fails

to "establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial," summary judgment is warranted.  <u>Celotex</u>

<u>Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.

242, 247 (1986).  "By its very terms, this standard provides that the mere existence of

<u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment; the requirement is that there be no <u>genuine</u>

issue of <u>material</u> fact."  <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).  In other

words, "[o]nly disputes over facts that might affect the outcome of the suit under the

governing law will properly preclude the entry of summary judgment."  <u>Id.</u> at 248.

**B.      The Plaintiff's Claim for Wrongful Denial of Benefits Under the ERISA**

Under the ERISA, a participant in or beneficiary of a covered plan may sue "to

recover benefits due to him under the terms of the plan, to enforce his rights under the

terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

29 U.S.C. § 1132(a)(1)(B).  Although the "ERISA does not set out the appropriate

standard of review for [courts to apply in] actions under § 1132(a)(1)(B) challenging

benefit eligibility determinations," <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101,

109 (1989),

> the Supreme Court held that a denial of benefits challenged
> under ERISA § 1132(a)(1)(B) is to be reviewed under a de
> novo standard – not under the more deferential arbitrary
> and capricious standard – <u>"unless the benefit plan gives the
> administrator or fiduciary discretionary authority to
> determine eligibility for benefits or to construe the terms of
> the plan."</u>

Fitts v. Fed. Nat'l Mortgage Ass'n, 236 F.3d 1, 5 (D.C. Cir. 2001) (emphasis added)

(citing Firestone, 489 U.S. at 115).

       Therefore, in order to determine whether deferential review shall apply, the Court

must first determine whether the administrator or fiduciary whose decision the plaintiff is

challenging was granted discretion to make eligibility determinations.  Metro. Life Ins.

Co. v. Glenn ("Glenn"), __ U.S. __, __, 128 S. Ct. 2343, 2348 (2008).  In reviewing the

Plan to make this determination, the Court must be "guided by principles of trust law,"

and may "not interfere to control [the defendants' eligibility determination] in the exercise

of a discretion[,] [if that discretion was] vested in them by the instrument under which

they act."  Firestone, 489 U.S. at 111 (emphasis in original); see Glenn, __ U.S. at __, 128

S. Ct. at  2348 ("Where the plan provides to the contrary by granting 'the administrator or

fiduciary discretionary authority to determine eligibility for benefits,' '[t]rust principles

make a deferential standard of review appropriate.'" (emphasis in original) (citing

Firestone, 489 U.S. at 115)); see, e.g., Fitts, 236 F.3d at 5 (finding that in the absence of

any express delegation, the benefits plan did not assign discretionary authority to a claim

administrator by virtue of either the provision that required claimants to submit proof of

eligibility to the administrator or the provision that permitted the plan administrator to

delegate its discretion).  "In determining whether a plan grants the administrator

discretionary authority, the reviewing court should focus on 'the character of the authority

exercised by the administrators under the plan,' not on whether the plan uses the word

'discretion' or any other 'magic word.'"  Becker v. Weinberg Group, Inc. Pension Trust,

473 F. Supp. 2d 48, 61 (D.D.C. 2007) (quoting Block v. Pitney Bowes Inc., 952 F.2d

1450, 1453 (D.C. Cir. 1992).

In this case, the plaintiff maintains that because the Plan never explicitly states that MetLife is a fiduciary of the Plan, and the Plan does not delegate any discretionary authority to MetLife by name, MetLife's determinations under the Plan are not entitled to any deference and therefore de novo review is required.  Pl.'s Mem. at 4, 17-22.  In response, the defendants contend that MetLife's eligibility determination is entitled to deference because, as the administrat of claims and a fiduciary of the plan, it was granted discretion to render a decision on the plaintiff's benefit eligibility and, in the end, did nothing more than apply the express provisions of the Plan.  Defs.' Mem. at 13-17.  Upon reviewing the administrative record, the Plan, and the applicable legal authority, the Court finds for the reasons set forth below that the defendants have the stronger position – MetLife is a fiduciary under the Plan empowered with the express discretion to render benefit eligibility decisions, and therefore deferential review of its decision is required.

In pertinent part, the ERISA provides the following definition of a "fiduciary:"[8]

---

[8]    The plaintiff relies upon the definition of the term "named fiduciary," contained in 29 U.S.C. § 1102(a), in maintaining that MetLife must be expressly identified as a fiduciary in the Plan to have fiduciary status, Pl.'s Mem. at 17.  This position misreads the statute.  The provision expressly states that a plan "shall provide [in writing] for one or more named fiduciaries who jointly or severally shall have authority to control and manage the operation and administration of the plan."  § 1102(a)(1).  However, the provision goes on to state in the very next subsection that a

> "named fiduciary" . . . [is] a fiduciary who is named in the plan
> instrument, or who, pursuant to a procedure specified in the plan,
> is identified as a fiduciary (A) by a person who is an employer or
> employee organization with respect to the plan or (B) by such an
> employer and such an employee organization acting jointly.

§ 1102(a)(2) (emphasis added).  Indeed, the Plan expressly names BearingPoint as the Plan administrator and authorizes MetLife, by name, to process claims for long-term benefits.  Defs.' Mem. at 17, Ex. A at ML00099-100 (Long-Term Disability Benefits Plan).  MetLife is a "named fiduciary," not by any express statement reiterating that "MetLife is a fiduciary," as the plaintiff would require, but by virtue of its claims processing duties expressly outlined in the Plan; in other words, it assumes a fiduciary role "to the extent" of its claims processing authority.  § 1002(21)(A).  If this result were not the case, the ERISA's definition of a "fiduciary" would be

(continued . . .)

> a person is a fiduciary with respect to a plan to the extent
> (i) he exercises any discretionary authority or discretionary
> control respecting management of such plan or exercises
> any authority or control respecting management or
> disposition of its assets, . . . or (iii) he has any discretionary
> authority or discretionary responsibility in the
> administration of such plan.

29 U.S.C. § 1002(21)(A).  The Plan expressly identifies BearingPoint as the Plan

administrator.  Defs.' Mem., Ex. A at ML00099 (Long-Term Disability Benefits Plan).  In

addition, under the heading "Statement of ERISA Rights," the Plan further states that

"[t]he people who operate [the] Plan[] [are] called 'fiduciaries' of the Plan."  Id. at

ML00102.  The Plan also includes a provision setting forth a claims procedure in which

MetLife is identified by name as the entity responsible for receiving claims, reviewing

claims, and determining eligibility.  Id. at ML00100.  By this arrangement, MetLife

operates a portion of the Plan, and thus qualifies as fiduciary to the extent of its

designated role as the claims processor.  See Coleman v. Nationwide Life Ins. Co., 969

F.2d 54, 61 (4th Cir. 1992) ("[T]he inclusion of the phrase 'to the extent' in § 1002(21)(A)

means that a party is a fiduciary only as to the activities which bring the person within the

definition . . . [and only to the extent] allocated by the plan documents themselves."); see

also Plumb v. Fluid Pump Serv., Inc., 124 F.3d 849, 855 (7th Cir. 1997) ("[A]n insurer

generally will not be held to be a fiduciary with respect to an activity unless the plan

documents show that the insurer was responsible for that activity.").

 The only remaining question then is whether the Plan allocates any discretionary

authority to MetLife.  The plaintiff's assertion that no provisions of the Plan "allow[] for

---

superfluous because it defines a fiduciary not solely by whether a fiduciary is expressly
identified, but rather also by "the extent" of that entity's responsibilities under a benefits plan.  Id.

[the] granting of discretion to Metlife" ring hollow, Pl.'s Mem. at 21, because two express provisions of the Plan resolve that question by empowering MetLife with the discretion to interpret and apply the Plan.  The first provision, included under the title "Certificate of Insurance," states: "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract.  This includes the Group Policy, Certificate and any Amendments."  Defs.' Mem., Ex. A at ML00071 (Long-Term Disability Benefits Plan).  The second, a subsection under the heading "Claims Information" in the section of the Plan related to long-term disability benefits, states:

> **Discretionary Authority of Plan Administrator and Other Plan Fiduciaries**
>
> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

Id. at ML00100-01.

The plaintiff acknowledges, as he must, that "no 'magic word' or language [is] required to grant . . . discretionary authority," Pl.'s Mem. at 18; see Becker, 473 F. Supp. 2d at 61 (citing Block, 952 F.2d at 1453), and all the wealth of persuasive case law he cites stating that discretionary review is inappropriate absent a clear delegation is not inapposite, Pl.'s Mem. at 20-21.  Whatever minimum verbal expression is necessary, the Court does not hesitate to find that it has been satisfied by the two provisions of the Plan referenced above.  The Court therefore finds that the Plan contains the requisite "[e]mpowering language" conveying discretion to MetLife as a fiduciary under the Plan,

and thus it must employ a discretionary, or "reasonableness" review to MetLife's

eligibility determination.  Block, 952 F.2d at 1453; see Wagener v. SBC Pension Benefit

Plan-Non Bargained Program, 407 F.3d 395, 403 (D.C. Cir. 2005) (stating that where a

court is reviewing an interpretation of a benefits plan provision by an administrator or

fiduciary under the arbitrary and capricious standard of review, and the plan's language

"reasonably supports" that interpretation, a court must defer to the administrator or

fiduciary). Compare de Nobel v. Vitro Corp., 885 F.2d 1180, 1187 (4th Cir. 1989), quoted

in Block, 952 F.2d at 1453-54 (stating that where "[i]t  . . . appear[s] on the face of the

plan documents that the fiduciary has been 'given [the] power to construe disputed or

doubtful terms' – or to resolve disputes over benefits eligibility – . . . 'the trustee's

interpretation will not be disturbed if reasonable" (internal citations omitted)), with Fitts,

236 F.3d at 5 (finding that, even though the insurer's existing plan conveyed discretionary

authority to the insurer, no discretion was conveyed to the insurer under the long-term

disability plan where the insurer merely "'purchas[ed] and incorporate[ed] into its plan

the terms of the long-term disability policy'").

## III.  ANALYSIS

### A.      Maintaining Claims for Both Breach of Fiduciary Duty and Denial of Benefits

The defendants contend that the plaintiff cannot maintain both a claim for breach

of fiduciary duty under §1132(a)(3) and a claim for denial of benefits under §

1123(a)(1)(B) of the ERISA.  Defs.' Mem. at 12-13.  The plaintiff's opposition to this

position is not well articulated.  The plaintiff appears to represent two contradictory

positions: first, that "the complaint . . . at no time request[s] relief for a breach of

fiduciary duty," and, second, that many circuits permit a plaintiff to jointly assert claims

under both 29 U.S.C. § 1132(a)(3) and § 1132(a)(1)(B).  Pl.'s Mem. at 16-17.  Because

the plaintiff has specifically invoked both ERISA sections in his complaint, Compl. ¶ 4,

cites legal authority which he contends favors both theories being asserted in the same

action, Pl.'s Mem. at 16-17, and reasserts both arguments in his reply brief, Pl.'s Reply at

3-4, the Court will first undertake the analysis of whether both claims can be brought

despite the plaintiff's plain statement that he does not seek "relief for a breach of fiduciary

duty," Pl.'s Mem. at 16.[9]

　　　　Although the District of Columbia Circuit has yet to weight in on this issue, "the

majority of circuits that have decided this issue have held that a breach of fiduciary duty

claim cannot stand where a plaintiff has an adequate remedy through a claim for benefits

under § [1123](a)(1)(B)."[10]  See Clark v. Feder Semo & Bard, P.C., 527 F. Supp. 2d 112,

---

[9]　　　Although the Court could deem the argument abandoned given the plaintiff's representations, where, as here, "it is not clear that the plaintiff[] ha[s] unequivocally abandoned [his] . . . claim[][,] prudential concerns favor" examining the issue.  E.g., Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., __ U.S. __, __, 129 S. Ct. 1109, 1117 (2009).

[10]　　　The plaintiff cites a string of cases to support his argument that a claim under § 1132(a)(3) and § 1132(a)(1)(B) can be maintained in the same action.  See Pl.'s Mem. at 16-17.  The plaintiff has not explained how any of the cases, which he cites in no particular authoritative or chronological order, support his position.  Upon review of these cases, some of them appear irrelevant, see Harris v. Epoch Group, L.C., 357 F.3d 822, 825 (8th Cir. 2004) (holding that a benefits plan could incorporate state law to extend ERISA protections); Buce v. Allianz Life Ins. Co., 247 F.3d 1133, 1148-49 (11th Cir. 2001) (same), while other cases either never reach the issue, see Plumb v. Fluid Pump Serv., Inc., 124 F.3d 849, 862 (7th Cir. 1997) (finding that although a participant could maintain a wrongful denial of benefits claim, his fiduciary was not entitled to pursue that same claim, and remanding the case back to the district court to determine whether the fiduciary could pursue equitable relief), or offer only weak implicit support, see Conley v. Pitney Bowes, 34 F.3d 714, 717-19 (8th Cir. 1994) (holding that employee was not required to exhaust available administrative remedies before bringing wrongful denial of benefits claim, and that the lower court improperly summarily entered judgment against plaintiff on all of his claims, including claims for wrongful discharge and breach of fiduciary duty based on failure to exhaust administrative remedies).  The plaintiff only cites one case that seems to address the issue on some level, albeit without real discussion.  See Juliano v. Health Maint. Org. of N.J., Inc., 221 F.3d 279, 292-93 (2d Cir. 2000) (reviewing whether the trial judge abused her discretion in rendering decisions in suit alleging wrongful denial of benefits and equitable claims under the ERISA and other federal law).  However, the Court is not swayed by what the Court said in the

(continued . . .)

116 (D.D.C. 2007) (comparing <u>Korotynska v. Metro. Life Ins. Co.</u>, 474 F.3d 101, 102-03 (4th Cir. 2006) ("Because adequate relief is available for the plaintiff's injury through review of her individual benefits claim under § 1132(a)(1)(B), relief under § 1132(a)(3) will not lie."), and <u>Antolik v. Saks, Inc.</u>, 463 F.3d 796, 803 (8th Cir. 2006) (same), and <u>Tolson v. Avondale Indus., Inc.</u>, 141 F.3d 604, 610 (5th Cir. 1998) (same), with <u>Devlin v. Empire Blue Cross & Blue Shield</u>, 274 F.3d 76, 89-90 (2d Cir. 2001) (holding that "a private cause of action for breach of fiduciary duty [is not prohibited] when another potential remedy is available," but any equitable remedy is limited to appropriate relief)). And, in previous consideration of this issue, at least three separate members of this Court have sided with the majority of circuits and found that a plaintiff cannot maintain an equitable claim for breach of a fiduciary duty where the ERISA provides an adequate remedy at law.  <u>Clark</u>, 527 F. Supp. 2d at 117 ("Because the gravamen of plaintiff's complaint is that she was improperly denied benefits, the remedies under § [1132] (a)(1)(B) would make plaintiff whole if she were to prevail on her claim.  Plaintiff therefore has an adequate remedy under § [1132](a)(1)(B), and accordingly her § [1132](a)(3) claim must be dismissed."); <u>Crummett v. Metro. Life Ins. Co.</u>, 2007 WL 2071704, at *3 (D.D.C. July 16, 2007) (concluding "with little hesitancy that [plaintiff's] remedies pursuant to subsection (1)(B) are adequate and that her fiduciary-duty claim must be dismissed"); <u>Hurley v. Life Ins. Co. of N. Am.</u>, 2005 U.S. Dist. LEXIS 43038, at *32 (D.D.C. July 7, 2005) (concluding that "the claim for ERISA breach of fiduciary duty

---

<u>Juliano</u> opinion because its discussion on the subject is cursory at best and does not dissuade the Court from following the more detailed, countervailing rationale expressed by this Court's colleagues, who followed the prevailing view of the circuits that have considered the issue.

is preempted by the existence of a valid claim . . . for denial of benefits").  The Court

finds the position of its colleagues persuasive, and applying it to this case, concludes that

because awarding the plaintiff relief under § 1132(a)(1)(B) would fully redress his

alleged injury, any claim the plaintiff is making for equitable relief under § 1132(a)(3) is

precluded.

**B.      The Plaintiff's Claim for Wrongful Denial of Benefits Under the ERISA**

The plaintiff contends that because a seropositive test is not itself a test which

determines whether a person has rheumatoid arthritis, the Plan's distinction between

seropositive and seronegative should not be determinative of his entitlement to continued

long-term disability benefits in light of his significant impairment resulting from

rheumatoid arthritis.  Pl.'s Mem. at 8-9.  The plaintiff points out that because only 70% of

individuals with rheumatoid arthritis test seropositive and the remaining 30% test

seronegative, even though the two conditions are "immunogenetically similar" based on

some medical literature, the Plan's distinction between the two conditions is nonsensical,

"illusory," and unenforceable.[11]  Id. at 12-15, 24-28.

---

[11]      In addition to his other arguments, the plaintiff also contends that the Plan's distinction between seronegative and seropositive is "ambiguous," Pl.'s Mem. at 24, as is its definition of "rheumatoid arthritis," Pl.'s Mem. at 29.  A legal ambiguity implies "two or more reasonable ordinary" meanings of a term.  Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs., 545 U.S. 967, 989 (2005).  Because medical testing, regardless of whether the plaintiff agrees with its appropriateness, can determine affirmatively whether a participant has rheumatoid arthritis, and whether the participant is either seronegative or seropositive, as undisputed medical diagnostic testing established in the plaintiff's case, Pl.'s Mem. at 5, 13, and because the Plan relies on diagnostic evidence offered by the plaintiff, Defs.' Mem., Ex. A at ML00091 (Long-Term Disability Benefits Plan), the Court is at a loss as to how there is any ambiguity as to whether the plaintiff's condition entitles him to coverage under the plan for more than twenty-four months.
   Similarly, the Court will not entertain the plaintiff's arguments that the absence of "objective proof" of his condition resulted in his claim being improperly denied.  Pl.'s Mem. at 29-32.  Under the Plan, a participant must submit proof of a qualifying condition to justify the receipt of benefits.  Defs.' Mem., Ex. A at ML00091, ML00100 (Long-Term Disability Benefits Plan).  The plaintiff admits, and his physician's diagnoses are in accord, that he does not test

(continued . . .)

The defendants do not dispute that the plaintiff was "clinically diagnosed by his physicians as [having] an inflammatory disease of the joints or an inflammatory polyarthritis, satisfying the Plan's definition of a 'disease or disorder [of the] extremities and their surrounding soft tissue,'" Defs.' Mem. at 18, or that he was disabled under the Plan's definition when he applied for and received long-term disability benefits, Defs.' Opp'n & Reply at 10.  However, the defendants maintain that the plaintiff's condition of seronegative rheumatoid arthritis is not a condition for which the Plan extends continued long-term disability coverage.  Defs.' Mem. at 19 & Ex. A at ML00088 (Long-Term Disability Benefits Plan).  And the defendants maintain that the distinction between being seronegative and seropositive can be medically diagnosed, and that MetLife did nothing more than strictly apply an express limitation on continued coverage as set forth in the Plan.  Defs.' Mem. at 17-20; Defs.' Opp'n & Reply at 13.

Contrary to the plaintiff's argument, the Plan's coverage for rheumatoid arthritis is not "illusory."  Pl.'s Mem. at 24-28.  To the extent that the plaintiff misconstrues the Plan as providing long-term disability benefits beyond twenty-four months for any rheumatoid arthritis diagnosis, as his arguments suggests, Pl.'s Mem. at 25, 28, 32, he ignores the plain language of the Plan.  A rheumatoid arthritis diagnosis entitles a participant to twenty-four months of long-term disability coverage, and unless the participant tests seropositive, which is the diagnosis of 70% of the population with rheumatoid arthritis,

---

seropositive.  Pl.'s Mem. at 15; Defs.' Mem., Ex. A at ML00545 (Dec. 30, 2004 Letter from Claudia J. Svara, M.D., to Whom It May Concern); ML00546-47 (Dec. 20, 2004 Letter from Rex McCallum, M.D., to Sirs); ML00551 (Dec. 7, 2004 Letter from A. Silvia Ross, M.D., to Sirs). The fact that the plaintiff cannot submit proof that he is seropositive does not mean that "objective evidence cannot be obtained," Pl.'s Mem. at 31, but rather that objective evidence that he is seropositive cannot be obtained in his favor.

Pl.'s Mem. at 12,[12] a participant cannot receive coverage beyond the restricted time frame, as there is an express limitation on coverage for participants who are seronegative, Defs.' Mem., Ex. A at ML00088 (Long-Term Disability Benefits Plan).

The plaintiff also appears to rely on the notion that he is entitled to "long-term" benefit coverage so long as he is disabled and unable to work.  Pl.'s Mem. at 32.  The Court does not dispute that the plaintiff's health is significantly impacted by his medical condition, and that his ability to work has also been impaired to a significant degree since his diagnosis.  See Pl.'s Mem. 4-8.  However, despite these unfortunate circumstances, the Court cannot read into the Plan coverage where none exists.  And although the benefits plan does not satisfy the plaintiff's need for coverage, its failure to do so is not a violation of the law.  See Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 511-512 (1981) (observing in the context of a nonforfeitable rights provision in an ERISA-covered plan, that the plan, and not the ERISA, "defines the content" and "control[s] the level of benefits").  Therefore, where, as here, the "the plain language of [a Plan's coverage provision] leaves no room for ambiguity," it is "reasonable" to interpret the provision as written.  Becker, 473 F. Supp. 2d at 63.

The plaintiff also contends that the exception to the coverage limitation should apply to him because medical testing can be inaccurate and affected by outside factors such as the use of prescription drugs and the timing of the diagnostic testing, yet he cites

---

[12]     The Court will not entertain the plaintiff's argument to the extent that he makes wide-sweeping, unsupported allegations, such as claims that "the insurer deliberately chose carefully worded language chosen so as to avoid nearly all coverage for person [sic] suffering from rheumatoid arthritis."  Pl.'s Reply at 8, 10.  In fact, the plaintiff's own medical evidence indicates that 70% of persons diagnosed with rheumatoid arthritis will qualify for the exception to the limitation on coverage because they are seropositive.  See Pl.'s Mem. at 13-14; Pl.'s Reply at 10.

no legal authority that would permit the Court to disregard the plain language of the Plan.

Pl.'s Mem. at 11-14.  Nor has the plaintiff offered anything but conjecture to demonstrate

that he is in the category of patients who could test seropositive but for the medication he

is taking or the timing of the tests.  Pl.'s Mem. at 15.  Absent any legal footing or factual

proof for this position, the Court is no position to dictate the manner in which medical

diagnoses are rendered or question whether physicians are properly taking into account

outside factors that could possibly interfere with the rendering of accurate diagnoses.

Nothing in the Court's decision should be construed as suggesting that the defendants

have complete discretion to dictate or apply the terms of the Plan as they see fit or that

the plaintiff would not be entitled to continued coverage if he could show that he met the

conditions for such coverage.  Rather, the decision simply rests on the principle that

where the Plan includes terms that otherwise comport with the ERISA, even if medical

distinctions appear to split hairs, it is not for the Court to question the sensibility of those

terms, which were presumably negotiated between the plaintiff's employer and the

defendants, without any legal or factual support for doing so.  The plaintiff's reliance on

arguments incorporating common law theories of contract may seem reasonable, but

those theories are precluded where the ERISA sets forth the exclusive causes of action.

See Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 54 (1987) ("The deliberate care with

which ERISA's civil enforcement remedies were drafted and the balancing of policies

embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil

enforcement remedies were intended to be exclusive.").  By the terms of the Plan, the

limitation on the plaintiff's coverage applies, and he failed to satisfy any exception to this

limitation based on medical evidence demonstrating that he had "[a]n inflammatory

disease of the joints supported by clinical findings of arthritis <u>plus positive serological</u> <u>tests for connective tissue disease</u>."  Defs.' Mem., Ex. A at ML00088 (Long-Term Disability Benefits Plan) (emphasis added).  Thus, because the Court has no reason to conclude that the limitation and its exceptions in the Plan "[themselves] violate[] federal law," MetLife's "strict compliance with the substantive terms of [the] employee benefit plan cannot be termed arbitrary and capricious."  <u>Foltz v. U.S. News & World Report,</u> <u>Inc.</u>, 613 F. Supp. 634, 639 (D.C. Cir. 1985).

As an additional factor to consider in the analysis of whether the defendants have interpreted and applied the provisions of the Plan appropriately, the Court must determine whether the inherent conflict of interest that exists by virtue of MetLife's position as both the insurer and the processor of claims should affect the Court's decision.  <u>Glenn</u>, __ U.S. at __, 128 S. Ct. at 2350 ("[A] conflict should be weighed as a factor in determining whether there is an abuse of discretion . . . . [, but it does not] impl[y] a change in the standard of review, say, from deferential to de novo review." (internal quotations omitted)) (<u>citing</u> <u>Firestone</u>, 489 U.S. at 115).  Here, the inherent conflict is obvious: MetLife, as the insurer, must pay any benefit awarded, so it follows that it may have an incentive not to award benefits.  <u>See</u> <u>Glenn</u>, __ U.S. at __, 128 S. Ct. at 2348 ("[A]n employer who administered an ERISA benefit plan and who both evaluated claims and paid for benefits . . . . [is] quite possibly . . . what the Court [in <u>Firestone</u>] had in mind when it mentioned conflicted administrators.").  Yet, where, as here, the "[p]laintiff has offered no evidence that any alleged 'self-interested behavior' actually affected the . . . decision to deny . . . benefits," <u>Becker</u>, 473 F. Supp. 2d at 62, and in light of the Court's finding that MetLife merely applied an express limitation of the Plan as unambiguously

written, the Court cannot find that the inherent conflict resulting from MetLife's dual position as both insurer and claim processor improperly influenced its benefits determination.

**C.      Production of Documents Requested by the Plaintiff**

The plaintiff alleges that MetLife did not produce Plan-related documents he was entitled to receive upon his request.  Pl.'s Mem. at 32-38.  Specifically, the plaintiff maintains that "MetLife has an extensive series of guidelines which set forth instructions for review and administration of disability claims," guidelines that the plaintiff believes are relevant to the processing of his claim and that MetLife should have provided to him. Pl.'s Mem. at 2-3.  The plaintiff therefore contends that he is entitled to an award of statutory penalties for MetLife's failure to produce these documents.  Pl.'s Mem. 35-41; Pl.'s Reply at 12-13.

The defendants respond that MetLife produced all of the documents the plaintiff is legally entitled to receive, which included all documents related to the plaintiff's claim, Defs.' Mem. at 24-25; Defs.' Opp'n & Reply at 17-18, and that it informed the plaintiff that it was not the plan administrator and thus did not have to produce the Plan or Plan-related documents, Defs.' Mem. at 22-25.  MetLife also submitted a declaration from one of its employees attesting that the information the plaintiff now seeks, the company's "confidential and proprietary . . . [g]uidelines . . . database[,] . . . . is not tailored to any particular plan or type of plan" and  "[was] not referred to or otherwise used in the adjudication of the [p]laintiff's claim."  Defs.' Opp'n & Reply, Ex. 1 (Declaration of Timothy Suter Regarding the Administrative Record) ¶¶ 3, 7.  Therefore, MetLife contends that this information did not have to be produced.  Defs.' Opp'n & Reply at 18.

The ERISA provides that upon request, the administrator of a benefits plan must provide a claimant with "all documents, records, and other information relevant to the claimant's claim for benefits."  29 C.F.R. § 2560.503-1(h)(2)(iii).  A document is considered "relevant to the claim" if it "[w]as relied upon in making the benefit determination [or] . . . [w]as submitted, considered, or generated in the course of making the benefit determination, without regard to whether such document, record, or other information was relied upon in making the benefit determination."  29 C.F.R. § 2560.503-1(m)(8).

The administrative record indicates that MetLife responded to the plaintiff's numerous documents and records requests.  Defs.' Mem., Ex. A at ML00556 (Dec. 28, 2004 Letter from Jaci L. Mangene to Justin C. Frankel); ML02496 (Feb. 11, 2005 Letter from Jaci L. Mangene to Justin C. Frankel); ML02484 (Mar. 10, 2005 Letter from Jaci L. Mangene to Justin C. Frankel); ML00825 (Mar. 28, 2005 Letter from Jaci L. Mangene to Justin C. Frankel); ML00860-61 (Sept. 12, 2005 Letter from Jaci L. Mangene to Justin C. Frankel); ML02262 (Oct. 19, 2006 Letter from Leah McCarthy to Scott Elkind); ML02254 (Oct. 27, 2006 Letter from Leah McCarthy to Scott Elkind); ML02175 (Dec. 15, 2006 Letter from Leah McCarthy to Scott B. Elkind).  In particular, by a letter dated September 12, 2005, MetLife responded to the plaintiff's July 19, 2005 request for claim-related documents, by providing a number of documents contained in the plaintiff's claim file.  Defs.' Mem., Ex. A at ML00105-06 (Sept. 12, 2005 Letter from Jaci L. Mangene to Justin C. Frankel).  MetLife nonetheless indicated that it was not the Plan administrator and that the plaintiff would need to submit his request for all additional Plan-related documents to BearingPoint, the Plan administrator.  Id.  Specifically, MetLife stated:

> In response to Request 21, MetLife did not rely upon a
> particular internal rule or guideline in making the claim
> determination at issue.  The Plan definition of disability and
> other Plan terms were the guidelines used to make the
> claim determination.  You can obtain copies of the Plan
> documents as noted above [from BearingPoint].

Id.  However, there is no indication in the record, and the plaintiff does not allege, that

BearingPoint failed to produce any documents that the plaintiff requested.  See id. at

ML02581 (Dec. 14, 2004 Memorandum from Peter Wright to Jaci Mangene) (stating that

the plaintiff had requested the Plan from BearingPoint and anticipated that BearingPoint

would provide it to him by the following Wednesday).  In any event, the administrative

record contains a letter stating that MetLife provided the Plan to the plaintiff despite its

representation that it was under no obligation to do so.  Id. at ML00556 (Dec. 28, 2004

Letter from Jaci L. Mangene to Justin C. Frankel).  Therefore, to the extent that the

plaintiff's allegations of non-production encompass the Plan, the Court finds them

unpersuasive.  MetLife simply was not the Plan administrator according to the express

provisions of the Plan;[13] BearingPoint was, id., Ex. A at ML00099 (Long-Term Disability

Benefits Plan), and there is no conflicting evidence in the record that challenges the

representations that both defendants provided the plaintiff with a copy of the Plan shortly

after his claim was denied, id. at ML00556 (Dec. 28, 2004 Letter from Jaci L. Mangene

to Justin C. Frankel).  Nor has the plaintiff cited any binding legal authority in this

---

[13]      As the plaintiff correctly restates, Pl.'s Mem. at 38, the ERISA defines an "administrator"
as "the person specifically so designated by the terms of the instrument under which the plan is
operated."  29 U.S.C. § 1002(16)(A).  However, the plaintiff incorrectly represents that the Plan
fails to designate a Plan administrator, and thus urges that the Court find MetLife to be the de
facto administrator.  Pl.'s Mem. at 38-40.  By the express terms of the Plan, Defs.' Mem., Ex. A at
ML00099 (Long-Term Disability Benefits Plan), the plaintiff's assertions are factually inaccurate,
and need not be addressed further.

jurisdiction which indicates that the responsibilities of the Plan administrator may be

imposed upon a fiduciary under the Plan beyond what the law already requires.

Nonetheless, the Supreme Court's cautionary guidance bears repeating:

> Faced with the possibility of [$110[14]] a day in penalties
> under § 1132(c)(1)(B), a rational plan administrator or
> fiduciary would likely opt to provide a claimant with the
> information requested if there is any doubt as to whether
> the claimant is [entitled to the information], especially
> when the reasonable costs of producing the information can
> be recovered.

Firestone, 489 U.S. at 118.

As to MetLife's internal claims manual, the plaintiff's counsel indicates that he

learned of its existence during the course of other litigation not before this Court, yet he

contends that the provisions of those internal guidelines include provisions relevant to

MetLife's decision on the plaintiff's benefits claim.  Pl.'s Mem. at 3.  The Court cannot

make the inferential leap that MetLife utilized its internal guidelines in evaluating the

plaintiff's claim based solely on the plaintiff's unsupported allegations; such conclusory

allegations are inadequate to trigger a disclosure requirement.  Cf. Chung Wing Ping v.

Kennedy, 294 F.2d 735, 737 (D.C. Cir. 1961) (stating that deponents "should not have

been compelled to submit to a fishing expedition based on an unsupported and nebulous

allegation").  Further, the plaintiff misconstrues the case law he cites as mandating

disclosure of internal claims manuals and procedures and the ordering of the payment of

statutory penalties when such disclosure is not provided, which it does not in either

respect.  See Palmiotti v. Metro. Life Ins. Co., 2006 WL 510387, at *4 (S.D.N.Y. Mar. 1,

---

[14]    The current federal regulations increased the statutory penalty from $100 to $110 per day. See 29 C.F.R. 2575.502c-1.

2006) (rejecting the view that the claims manual was relevant under the relevancy standards of the Federal Rules of Civil Procedure and remanding the issue to the magistrate judge to consider "which particular portions, if any, of the Claims Manual do fall within the mandated disclosure provisions of [the ERISA] . . . [– i.e., whether the Claims Manual was] actually relied upon in making the adverse determination, [or was a] . . . policy statement[] or guidance with respect to the plan concerning the denied benefit for the claimant's diagnosis . . . ."); Palmiotti v. Metro. Life Ins. Co., No. 04 Civ. 718, 2006 WL 1637083, at *1 (S.D.N.Y. June 9, 2006) (exercising its discretion to award attorneys' fees and costs, but limiting by half any fees and costs associated with "the discovery issue relating to the use of MetLife's claims manual outside of the instant litigation" (emphasis added)).[15]   Moreover, where a plaintiff, as here, offers nothing but "speculative assertions that MetLife must have or should have consulted [its claims manual] in determining [his] eligibility for benefits," and where the plaintiff has put forth no "concrete evidence that the guidelines were 'relied upon' or 'submitted, considered, or generated'" in MetLife's processing of his claim, and where "MetLife has declared under penalty of perjury that [its internal] [g]uidelines were not referred to in any way," the Court will not "look behind [the] sworn declaration" and second-guess MetLife's assertions.  Brooks v. Metro. Life Ins. Co., 526 F. Supp. 2d 534, 536-37 (D. Md. 2007) (emphasis added).  Accordingly, having found no violation of the ERISA's disclosure requirement, the Court need not address whether the assessment of statutory penalties is warranted under 29 U.S.C. § 1132(c).

---

[15]     The Court in Palmiotti did not award statutory penalties as the plaintiff appears to maintain, Pl.'s Reply at 12; rather, it assessed discretionary attorneys' fees and costs under 29 U.S.C. 1132(g)(1).  2006 WL 1637083 at *1.

## IV. CONCLUSION

The ERISA exclusively governs the plaintiff's claim for long-term health related benefits.  Under the provisions of this statute, the plaintiff seeks redress under theories of both breach of fiduciary duty and wrongful denial of benefits, causes of actions that he cannot maintain simultaneously.  Therefore, because no equitable remedy is available where an alternative remedy under the ERISA is available, the Court must dismiss the plaintiff's breach of fiduciary duty claim.  With respect to the plaintiff's wrongful denial of benefits claim, the Plan classifies the defendants as fiduciaries under the Plan and allocates them discretionary authority to interpret and apply its terms, which the Court finds they have performed within the law.  While the plaintiff's concern about the inadequacy of the Plan is understandable, the Court is unable to find that the defendants' determination that the plaintiff is not entitled additional long-term benefits is legally incorrect; they are simply not provided for under the Plan.  Finally, the Court finds that the defendants complied with their obligations to produce Plan-related documents to the plaintiff. Therefore, despite the unfortunate circumstances that have befallen the plaintiff, for the reasons expressed in this opinion, the Court must award summary judgment to the defendants.[16]

---

[16]     An Order consistent with the Court's ruling was issued on March 27, 2009.